

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-13-2009

# Meadows v. Anchor Longwall

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2580

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Meadows v. Anchor Longwall" (2009). *2009 Decisions.* Paper 2052.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/2052

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 07-2580


DONALD E. MEADOWS, JR.;
AMANDA MEADOWS, husband and wife

v.

ANCHOR LONGWALL AND REBUILD, INC.,
a West Virginia corporation

v.

LEWIS-GOETZ CO. INC., successor-in-interest
of Gooding & Shields Rubber Co.;
SYSTEM STECKO, a Division of Dayco Europe, Ltd.

Third Party Defendants

Donald E. Meadows, Jr.,
Amanda Meadows,
Appellants


On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. Civil No. 02-cv-02062)
District Judge: The Honorable Katharine S. Hayden
Magistrate Judge: The Honorable Amy Reynolds Hay


Argued December 2, 2008

Before:  AMBRO and GREENBERG, Circuit Judges,
and O'NEILL,[*] District Judge

(Filed January 13, 2009 )

Richard J. Schubert, Esquire (Argued)
AlpernSchubert P.C.
330 Grant Street
2727 Grant Building
Pittsburgh, PA   15219-0000

        Counsel for Appellants

Kathleen S. McAllister, Esquire (Argued)
DiBella, Geer, McAllister & Best
312 Boulevard of the Allies, 3rd Floor
Pittsburgh, PA   15222-0000

        Counsel for Appellees

Stanley A. Winikoff, Esquire (Argued)
Michael C. Hamilton, Esquire
Winikoff Associates, 13th Floor
Four Gateway Center
Pittsburgh, PA   15222-0000

        Counsel for Third-Party Appellees

OPINION

O'NEILL, District Judge

        Appellants Donald E. Meadows, Jr. and Amanda Meadows appeal the final

_____

[*]The Honorable Thomas N. O'Neill, Jr., United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

judgment entered by the District Court[1] in favor of appellee Anchor Longwall and Rebuild, Inc. (Anchor). Appellants contend the District Court erred in its May 3, 2007 final order excluding appellants' expert witness' testimony. Appellants also challenge the District Court's grant of Anchor's motion for partial summary judgment dismissing appellants' claims for strict liability against Anchor under Restatement (Second) of Torts § 402A. Finally, appellants challenge the District Court's sua sponte grant of summary judgment in favor of third-party defendant System Stecko as to Anchor's claim of contribution against Stecko. For the following reasons, we will affirm the District Court's orders.

## I.

Because we write only for the parties, our factual summary is brief. Appellants filed a civil complaint on November 29, 2002, asserting claims against appellee Anchor for strict liability, negligence, breach of warranty, emotional distress and loss of consortium for Meadows' injuries that occurred while pressurizing a mine shield against the roof of the Maple Creek Mines where he was employed. Appellants allege that a shut-off valve fitting replaced by Anchor during a refurbishing project malfunctioned, pulled loose from the valve assembly housing due to the pressure of the hydraulic fluid, and struck Meadows on the right side of his face. As a result of the accident, Meadows

---

[1]By consent of the parties, Magistrate Judge Hay conducted all proceedings in this case as provided for by the 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.

3

lost use of his right eye.

The accident occurred on December 6, 2000 while Meadows was installing 800-ton longwall shields originally manufactured and designed by Meco-Dowty in the Mine. Meadows was employed by the Mine as a longwall helper/longwall utility man. Longwall shields are placed in succession and after each shield is in place its leg jacks (hydraulic lift cylinders) are pressurized to raise the canopy of the shield to the mine roof. Meadows was engaged in manually pressurizing a shield, likely the shield known as Longwall International 045 (Shield # 45), which required him to stand close to the hydraulic system when a shut-off valve fitting pulled loose from the valve assembly housing and struck him in the face.

Shortly before the accident, the Mine contracted with Montgomery Equipment Company to repair approximately 189 of its longwall shields. Montgomery subcontracted with several repair companies, including Anchor, to refurbish and/or repair the shields. Anchor repaired 39 of the 189 longwall shields repaired for the Mine, including Shield # 45, which discovery revealed was likely the shield on which Meadows was working at the time of his accident. As part of the repair and refurbishment project, Anchor replaced hoses and valves and installed new hose kits, including Stecko valves of a type that Meadows alleges caused his injury. Anchor's paperwork revealed that Shield # 45 was missing a base lift jack at the time it was received and that the Mine elected not to replace it.

4

Appellants hired Mark A. Sokalski, P.E., to investigate the cause of the valve malfunction and testify as an expert witness as to liability and causation. Sokalski testified in his deposition that the accident occurred when Meadows started "using manual levers . . . he ended up a little out of sequence when he was doing it manually and left the ram bar down," which created a "spike" in the pressure that over-pressurized a defective valve. Sokalski testified that the valve "exploded" because Anchor omitted a check valve when it refurbished the shield that was part of the original shield design and would have relieved the over-pressurization. In hydraulic systems, the check valve is a safety feature built into the device to sense and relieve excessive pressure by allowing the over-pressurized fluid to flow back into the system to a relief valve, which is another safety device on the system. After examining a number of Stecko valves, Sokalski found that the threads of the male and female connections of the valve were incorrectly cut, rendering the valve subject to failure at pressures below its expected failure pressure. Though he admitted that he could not replicate the exact conditions of the mine shield's hydraulic system when it failed in his testing , he testified that, using principles of physics, a pressure spike was caused in the hydraulic fluid within the shield system that contributed to the failure of the Stecko valve.

Invoking the District Court's diversity jurisdiction, appellants filed, on November 29, 2002, a multi-count complaint against Anchor alleging negligence and strict liability under the Restatement (Second) of Torts § 402A. Once discovery showed that the shield

5

in question was likely Shield # 45, Anchor filed a third-party complaint joining Lewis Goetz and Company and Stecko, respectively the supplier and the manufacturer of the valve in question, seeking indemnity/and or contribution. The District Court granted Lewis-Goetz's unopposed motion for summary judgment because no party could prove that the valve in appellants' counsel's custody was supplied by Lewis-Goetz.

Anchor then filed a motion for partial summary judgment with regard to appellants' strict liability claim which the District Court granted on April 17, 2006 on the basis that Anchor did not sell or supply a product but rather provided a service which is not subject to strict liability claims. On August 28, 2006, the Court granted Stecko's motion for partial summary judgment with regard to any claim of Anchor against Stecko for indemnity, finding that none of the theories of liability Anchor asserted against Stecko would support such a claim. Next, on January 5, 2007 the Court sua sponte granted summary judgment as to any claims for contribution by Anchor against Stecko, finding that no evidence identified by Anchor supported a claim for strict liability against Stecko.

Appellants' negligence claim against Anchor was the only remaining claim. After the close of discovery, Anchor filed a motion in limine to exclude the testimony of appellants' only expert on liability and causation, Sokalski. After a hearing on February 1, 2007, the District Court made a determination that the proposed testimony did not meet the requirements for expert testimony under Federal Rule of Evidence 702 and the factors outlined by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509

6

U.S. 579, 589 (1993), because it was insufficient, not based on an appropriate foundation, and inadequately tied to the facts of the case. After excluding Sokalski's testimony, the District Court granted final judgment in favor of Anchor on May 3, 2007. Appellants filed a timely notice of appeal on May 23, 2007.

## II.

The District Court had jurisdiction over this diversity action under 28 U.S.C. § 1332. We have jurisdiction over the final orders of the District Court pursuant to 28 U.S.C. § 1291.

We exercise plenary review over the District Court's decision to grant summary judgment. NBT Bank Nat'l Assoc. v. First Nat'l Comm. Bank, 393 F.3d 404, 409 (3d Cir. 2004). "Affirming the grant of summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Id. (citation omitted). We resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. See DL Res. Inc. v. FirstEnergy Solutions Corp., 506 F.3d 209, 216 (3d Cir. 2007).

In reviewing the exclusion of expert testimony under Daubert, we must determine whether the District Court abused its discretion. Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008). "An abuse of discretion arises when the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." In re TMI Litig., 193 F.3d 613, 666 (3d Cir. 1999) (internal

7

quotation marks omitted).  This Court does not interfere with the District Court's decision

"unless there is a definite and firm conviction that the [District Court] committed a clear

error of judgment in the conclusion it reached upon a weighing of the relevant factors."

Id.  (internal quotation marks omitted).  To the extent that the District Court's decision

involved a legal interpretation of the Rules of Evidence, the review is plenary.  See id.

## III.

### A.    Strict Liability Claim

The District Court properly granted summary judgment on appellant's claim for

strict liability against Anchor, finding that Anchor serviced but did not manufacture or

redesign the allegedly defective product.  Meadows' complaint, inter alia, alleged that

Anchor was liable on a theory of strict liability under the Restatement (Second) of Torts §

402A.  Specifically, Meadows alleged that Anchor did not engage solely in servicing the

longwall shield that caused his injury but defectively redesigned, refurbished, re-

manufactured and reconditioned it.  The District Court granted summary judgment in

favor of Anchor and found that § 402A does not apply to a defendant such as Anchor who

neither sold nor manufactured the allegedly defective valve.

Restatement (Second) of Torts § 402A states that:

(1) One who sells any product in a defective condition unreasonably
dangerous to the seller or consumer or to his property is subject to liability
for physical harm thereby caused to the ultimate user or consumer, or to his
property, if
     (a) the seller is engaged in the business of selling such a product,
     and

8

      (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

   (2) The rule stated in Subsection (1) applies although

      (a) the seller has exercised all possible care in the preparation and sale of his product, and

      (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Pennsylvania adopted this provision in Webb v. Zern, 220 A.2d 853 (1966).   Comment f to Section 402A further explains that the section "applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor . . . .  It is not necessary that the seller be engaged solely in the business of selling such products."  See also Malloy v. Doty Conveyor, 820 F. Supp. 217, 220 (E.D. Pa. 1993), quoting Burch v. Sears, Roebuck & Co., 467 A.2d 615, 621 (Pa. Super. Ct. 1983), noting that a "seller" includes "all suppliers of a defective product in the chain of distribution, whether retailers, partmakers, assemblers, owners, sellers, lessors or any other relevant category."  See also Salvador v. Atlantic Steel Boiler Co., 307 A.2d 398 (Pa. Super. Ct. 1973), noting that a manufacturer of a defective product is liable under 402A regardless of whether the manufacturer is involved in the item's sale.

Service providers have long been excluded from strict liability.  See La Rossa v. Scientific Design Co., 402 F.2d 937, 942-43 (3d Cir. 1968) (interpreting New Jersey law and holding that, unlike mass produced goods, services are not marketed to a wide variety of the general public, so parties injured by poor services are in a better position to locate the tortfeasor and identify the defect caused by the tortfeasor's negligence); Lemley v. J &

9

<u>B Tire Co.</u>, 426 F. Supp. 1378, 1379-80 (W.D. Pa. 1977) (noting that there had been no expansion of Section 402A to include persons who supply a service).

Appellants argue that the District Court erred in determining that Anchor was not a manufacturer or seller of a product under § 402A because they allege that Anchor, in repairing and refurbishing the longwall shields, "redesigned" the hydraulic system and "sold" the redesigned system back to the Mine. Appellants point to the deposition testimony of the chief engineer at Anchor at the time of the longwall shield repair project, Edmond Groff that he made changes to the circuit or hydraulic drawings of Shield # 45 as evidence that his drawings constituted a modification of the original manufacturer's drawings of the hydraulic system. Appellants argue that Anchor performed a design function by modifying the original manufacturer's drawings and therefore engaged in an act that put itself in a position of a manufacturer. Anchor contends that, while Groff made a drawing of the hydraulic system, the hydraulic system was designed by the original equipment manufacturer, Meco-Dowty, and that any changes or modifications to the system were specifically requested and approved by the Mine. Anchor argues and presented evidence that it did not manufacture, purchase, sell or supply the shield at issue or the allegedly faulty valve that caused the injuries but merely attached the component to the shield unaltered from the way it was received from the manufacturer, appellee Stecko, and that the shields themselves were at all times owned by the Mine.

Pennsylvania law does recognize strict liability for a manufacturer of a product

regardless of whether the manufacturer was involved in the sale. See Webb v. Zern, 220 A.2d 853 (Pa. 1966). But adopting Meadows' theory that, by refurbishing and repairing the longwall shield, Anchor "redesigned," manufactured and sold a product to the Mine would effectively swallow the distinction between sellers of products and those that simply provide a service for the products after manufacturing. From the evidence in the record, Anchor did not hold itself out to be the seller of products such as valves or longwall shields. No evidence was presented to contradict that any changes in the drawings at issue were made at the request of the Mine and ultimately approved by the Mine. Further, no evidence was presented to contradict that the parts that Anchor used in refurbishing and repairing the shields were purchased in cooperation with the Mine.

Appellants also claim that Anchor is a "seller" under Section 402A because it played a role in requesting additional parts. However, this claim fails because any such requests by Anchor were merely incidental to servicing the shields as specified by the Mine and appellants have presented no evidence that the parts requested are the allegedly defective products at issue here. Finally, there is no evidence that Anchor was paid for any alleged redesign by the Mine as part of the repair project. Appellants provide no case law to support their theory that repairing and refurbishing constitutes "re-manufacturing" and "re-designing" under Pennsylvania law.[2] Anchor provided a service: the repair and

_____

[2]Appellants also attempt to get around the seller distinction by arguing that Anchor was a bailee of the longwall shield and that bailment can give rise to a claim under § 402A. See Berkbile v. Brantly Helicopter Corp., 337 A.2d 893, 898 n.3 (Pa. 1975). Appellants cite Kalumetals, Inc. v. Hitachi, 21 F. Supp.2d 510 (W.D. Pa. 1998), for

11

refurbishment of 39 of the Mines' longwall shields. We decline to hold that in repairing a longwall shield Anchor was involved in "re-designing" or "re-manufacturing."

The public policy considerations underlying strict liability also argue against holding that Anchor was a "seller" of products. The controlling question in whether someone qualifies as a seller, as Pennsylvania courts have pointed out, is the relationship between the defective product and the overall chain of distribution. See Frey v. Harley Davidson Motor Co., 734 A.2d 1, 17 (Pa. Super. Ct. 1999). The Pennsylvania Supreme Court has followed a four-part test in determining whether public policy requires the imposition of strict liability on a supplier of an allegedly defective product: (1) whether defendant is the only member of the marketing chain available to injured plaintiff; (2) whether the imposition of strict liability would serve as an incentive to safety; (3) whether defendant is in a better position than the consumer to prevent the circulation of defective products; and (4) whether defendant can distribute the cost of compensating for injuries resulting from defective products by charging for it in its business. Francioni v. Gibsonia Truck Corp., 372 A.2d 736, 739-40 (Pa. 1977).

---

support that § 402A applies in a bailment relationship. However, the Kalumetals analogy would apply only if an Anchor employee had been injured while working on a defective longwall shield. We fail to see how Kalumetals applies to Meadows' accident. Once the longwall shields were returned to the Mine, the bailer/bailee relationship terminated. See American Enka Co. v. Wicaco Mach. Corp., 686 F.2d 1050, 1053 (3d Cir. 1982), holding that "[a] bailment is a delivery or deposit of personalty under an implied or express agreement that at the termination of the bailment the personalty will be redelivered to the bailor, otherwise dealt with according to the bailor's directions, or kept until the bailor reclaims it."

12

First, as Anchor points out, appellants could have sued Meco-Dowty, the manufacturer of the longwall shield, or Stecko, the manufacturer of the allegedly defective valve. Second, imposing liability on Anchor would not serve as an incentive to safety since Anchor is not in the business of building, designing or manufacturing the shields or valves and therefore does not have control over the safety of the products. Similarly, Anchor is in no better position than the consumer to influence the manufacturing of safer mining products or prevent circulation of defective mining products because it acquired the products from the consumer for repair and was not in the original or direct chain of distribution. Anchor repaired only 39 of the Mine's shields; it was not mass producing the shields and valves. Finally, although Anchor could charge extra for its services to cover the potential cost of compensation for injuries, it ought not be required to distribute the cost of defects in products it did not design or manufacture.

Thus, the District Court properly granted summary judgment on the strict liability claim, as Meadows' allegations involved Anchor's service activities as a repairer rather than as a "seller" and such a claim sounds in negligence. See La Rossa, 402 F.2d at 942-43; Lemley, 426 F. Supp. at 1379-80.

B.   Exclusion of Expert Witness Testimony

The District Court did not abuse its discretion in excluding the testimony of appellants' expert witness, Sokalski. His testimony was Meadows' sole evidence of negligence. The Court found that Sokalski's testimony was not reliable under Rule 702

13

and so excluded his testimony and granted final judgment in favor of Anchor because the negligence claim was the only claim remaining after the Court granted Anchor's motion for partial summary judgment on strict liability.

Sokalski's opinion is based on several conclusions. First, Sokalski testified that the Stecko valve that struck Meadows in the eye was defective because its male threads were over-cut, which reduced its ability to fully and tightly grip the female threads, thereby reducing the burst pressure to approximately one-half of its published design. Second, Sokalski concluded that the mine's hydraulic system, which normally operates at between 1700 pounds per square inch ("psi") and 3200 psi, experienced a "spike" in pressure exceeding 100,000 psi on the Stecko valve. Third, Sokalski concluded that the spike was generated due to the ram bar on the shield being in the "down" position. Fourth, Sokalski concluded that there was no check valve between the two hoses that would have connected into the valve assembly and would have prevented the pressure spike. Lastly, he concluded that because the ball in the allegedly malfunctioning valve was "ovalled" and dented, extremely high pressure occurred there. Essentially, Sokalski alleged two defects in the shield after Anchor's repairs were completed that caused the accident: the presence of the ram bar in the down position that generated the spike in pressure and the absence of a check valve that would have prevented the valve from separating when the alleged spike occurred.

Sokalski testified regarding the tests he used to reach his conclusions. He

14

purchased three Stecko ball valves from the lot that was the source of the allegedly defective valve. He then connected the valves to a metal pipe filed with water and slowly increased the pressure on the water pipe with an air pump. He tested two of the valves in both the "open" and the "closed" positions. According to his tests, the valves failed at the 13,000 and 15,000 psi range by "an infinitesimal leak" of water escaping from the valve.

Meadows argues that the District Court abused its discretion in precluding Sokalski's testimony under Fed. R. Evid. 702 and Daubert. Rule 702 has three requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge, i.e., must be reliable; and (3) the expert's testimony must assist the trier of fact, i.e., must be fit. See Pineda, 520 F.3d at 244; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3d Cir. 1994).

First, to qualify as an expert under the rule, under our liberal standard, a witness must possess sufficient qualifications in the form of knowledge, skills and training. Pineda, 520 F.3d at 244, citing In re Paoli, 35 F.3d at 741. The District Court found that Sokalski has sufficient qualifications as a professional engineer to testify as an engineering expert under Rule 702 and the parties do not contest this finding.

The second requirement is that of reliability. According to Rule 702, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable. Pineda, 520 F.3d at 247, citing Daubert, 509 U.S. at 589. While a

15

litigant must make more than a prima facie showing that his expert's methodology is reliable, we have cautioned that "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." Id. at 248. The admissibility decision must focus on the expert's methods and reasoning, and credibility decisions should not be considered until after admissibility has been determined. Id., citing In re Paoli, 35 F.3d at 744. The language of Rule 702 requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation"; the expert must have "good grounds" for his or her belief. In re Paoli, 35 F.3d at 742, citing Daubert, 509 U.S. at 589. In sum, Daubert holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Id., citing Daubert, 509 F.3d at 589 n.9.

A trial court may consider several factors in evaluating whether a methodology is reliable, including but not limited to: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error, (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. Pineda, 520 F.3d at 247-48 (citations

16

omitted).  Additionally, in cases involving technical subjects like engineering, trial courts may consider relevant literature, evidence of industry practice, product design and accident history in evaluating reliability.  Id. at 248, citing Milanowicz v. The Raymond Corp., 148 F. Supp.2d 525, 536 (D. N.J. 2001).  "The inquiry envisioned by Rule 702 is . . . a flexible one."  Id., citing Daubert, 509 U.S. at 594.  The Daubert Court noted that the District Court's focus  "must be solely on principles and methodology, not on the conclusions that they generate."  509 U.S. at 595.  However, the Supreme Court has held that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (citations omitted).

Appellants assert that the District Court abused its discretion by, in effect, holding the expert to a higher standard of admissibility than required under our case law.  Specifically, appellants contend that because Sokalski's testimony concluding that excessive pressure caused hydraulic system failure was based on generally accepted principles of basic physics (recognized since the time of Sir Isaac Newton), it should have been deemed reliable.  Appellants note that this Court affirmed the decision of a District Court not to exclude testimony based in part upon general engineering principles.  Stecyk v. Bell Helicopter Textron, Inc., 1998 WL 599256, at *3 (E.D. Pa. Sept. 8, 1998), aff'd

17

Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002).  In Stecyk,

defendant General Motors argued that plaintiffs' expert utilized general engineering

principles to address leakage in the allegedly defective seal without any actual proof of a

defect.  Stecyk, 1998 WL 599256, at *7.  In addition to general engineering principles,

however, the expert supported his theory with substantial physical and reliable

documentary evidence.  Thus, the Court allowed the testimony because the expert

supplemented his conclusions based on general engineering principles with reliable

methodology.  Id. at *8.

In this case, as the District Court points out, Sokalski's methodology was not

reliable.  Sokalski did not attempt to replicate the conditions in the longwall shield at the

time of the accident; instead, he tested the valves without the hoses or connectors and

slowly increased pressure.  Sokalski did not examine the specific shield that Meadows

was working on at the time of the accident because it was returned to service in the Mine

so he could not say definitively whether the shield contained a check valve.  Further, there

was no reference to material, publication or literature describing the failure scenario he

presented, no evidence that his methodology was subjected to peer review or that it is

generally accepted, no outside documentary evidence, aside from his own report,

supporting his conclusions, no evidence concerning any known or potential error rates in

his testing, and no control standards.  Finally, Sokalski conceded that his pressure tests

did not replicate the accident as he hypothesized that it had occurred because he tested the

18

valve by increasing the pressure slowly using a pump instead of generating the dynamic spike he conceded occurred at the time of the accident; also his tests did not replicate the assembly of the hoses, connectors and Stecko block valve that existed in the mine because he did not use any hoses or connectors in his tests. Moreover, he did not research the maximum burst pressure of the hoses or connectors or otherwise test them with or without a check valve. The District Court noted that he speculated that had he used hoses and created a dynamic spike in pressure like the one he opines occurred in the accident the valve would have separated before the hoses would have blown. As the District Court noted, the expert's own testing did not support his hypothesis.[3] Thus it was not the "general physics principles" with which the District Court took issue, but rather the method by which Sokalski applied the principles to the facts of Meadows' accident. Here, the analytical gap between the data and the opinion proffered is too great and is connected only by the ipse dixit of the expert, not by any evidence. General Elec. Co., 522 U.S. at 146. Thus, the District Court properly excluded Sokalski's testimony because it failed to meet the reliability standard.

---

[3] As appellant correctly noted, testing need only be reasonably similar to the actual events. Substantial similarity does not require perfect identity between actual and experimental conditions. Stecyk, 295 F.3d at 412. Experimental evidence may be admitted even if conditions do not perfectly correspond to the conditions at issue in litigation; dissimilarities may affect the weight of the evidence, but not its admissibility. Id., citing Glick v. White Motor Co., 458 F.2d 1287, 1294 (3d Cir. 1972); Ramseyer v. Gen. Motors Corp., 417 F.2d 859, 864 (8th Cir. 1969). A ruling on substantial similarity is committed to the sound discretion of the trial judge. Id. Here, based on the record, it was not an abuse of discretion for the District Court to find that the testing was not substantially similar to the incident.

19

The third element under Rule 702, namely, whether the expert testimony would assist the trier of fact, "goes primarily to relevance." Lauria v. Amtrak, 145 F. 3d 593, 599 (3d Cir. 1998), quoting Daubert, 509 U.S. at 591. The expert's testimony must "fit" under the facts of the case so that "it will aid the jury in resolving a factual dispute." Id. The standard for the factor is not high; it is met when there is a clear "fit" connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case. Lauria, 145 F.3d at 600, quoting Paoli, 35 F.3d at 745. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id., citing Daubert, 509 U.S. 591-92. In other words, expert testimony based on assumptions lacking factual foundation in the record is properly excluded. See Stecyk, 295 F.3d at 414.

Appellants assert that the District Court wrongly rejected Sokalski's opinion that the accident was caused by Anchor's failure to install a check valve on Shield # 45. Sokalski testified that the original manufacturer's specifications and Anchor's schematics indicated that a check valve was to be installed in order to allow the hydraulic fluid to flow back into the system to a relief valve if the pressure on the base lift jack exceeded acceptable limits. Sokalski testified that he examined the drawings done by Anchor and observed that no check valves were indicated on Anchor's schematics, but Groff's uncontroverted testimony established that the diagram Sokalski relied upon represented a layout of the location of the hoses in the hydraulic system and that the original schematic

20

by Meco-Dowty contains all of the component parts, including the check valves. Moreover, the District Court found that, as Anchor ordered 50 check valves for the 39 machines they refurbished for the Mine and as Sokalski admitted that he did not know first-hand whether a check valve was installed in the shield at issue because he did not inspect it, Sokalski's testimony regarding the absence of the check valve did not fit with the otherwise uncontroverted evidence before the Court.

Additionally, there was no "fit" between Sokalski's testing of the Stecko valve and the facts. As previously noted, the testing did not replicate the hose assembly and he did not subject the valves to the dynamic pressure spike he alleges occurred. Neither did the tests he conducted on the Stecko valve duplicate the results that occurred in the mine, as no valve separated in these tests - a small amount of water leaked instead - and there was no evidence of any ovalling or indentation on the ball portion of the valve. The District Court correctly noted that "[g]iven the lack of resemblance Sokalski's tests have to the events in the mine, it is difficult to say how, if at all, these tests could assist the jury in determining what caused the accident."

Appellants also argue that the District Court made a "de facto Summary Judgment" decision on whether the longwall shield on which Meadows was working was equipped with a base lift cylinder. Sokalski's theory was that the "spike" in pressure was generated by the base lift jack/cylinder portion of the shield because the ram bar was in the "down" position. However, the evidence shows that when Shield # 45 was delivered to Anchor it

21

did not contain a base lift ram bar or a base lift jack housing. According to Anchor's records, Anchor did not put in a new base lift ram bar or a new base lift housing during its repairs and refurbishment of Shield # 45. Testimony by an inspector present at the Mine on the date of the incident indicates that the shield Meadows was working on at the time of the accident did not contain a base lift jack. No evidence was presented that the Mine supplied or paid for a new base lift jack. Additionally, no evidence was presented to contradict that the shield did not require a base lift jack to function.

The only evidence that appellants point to in order to prove the existence of a base lift cylinder in Shield # 45 was the equivocal deposition testimony of Groff that he thought that the base lift ram bar would have been replaced before the longwall shield was sent back to the Mine, not that he knew that it was replaced on Shield # 45. Thus, Sokalski's opinion, which depended on the existence of a base lift jack on Shield # 45 to cause the pressure increase, lacked a factual foundation in the record to satisfy the fit requirement and was properly excluded by the District Court. See Stecyk, 295 F.3d at 414.

Appellants argue that a factual dispute existed as to whether a base lift jack was attached to Shield # 45 because Anchor's paperwork was not correct or that a shield other than Shield # 45 was involved in the accident. However, as the District Court properly noted, appellants produced no evidence at the Daubert hearing that the paperwork was incorrect or that the incorrect shield had been identified in discovery. The photograph

22

that appellants allege supports that a base lift jack was on Shield # 45 at best suggests that the incorrect shield had been identified. However, as Anchor only refurbished 39 of the 189 shields in the Mine repair project, Meadows would have had to also identify that the malfunctioned shield was refurbished by Anchor because it would have been possible that Anchor did not repair the relevant shield if it was not Shield # 45. Thus, if Shield # 45 was correctly identified, it did not have a base lift jack so it could not have malfunctioned in the way that Sokalski opined caused the accident. If Shield # 45 was not correctly identified as the mine shield at issue, no evidence existed that this unidentified shield was one that Anchor repaired.

For the foregoing reasons, we find that the District Court did not abuse its discretion in excluding the testimony of appellants' expert witness. Sokalski's testimony failed to meet the reliability and fit requirements for admitting expert testimony and was therefore properly excluded under both, although either would have been sufficient.

C.    Dismissal of System Stecko

Appellants' challenge of the District Court's sua sponte grant of summary judgment in favor of third-party defendant Stecko is moot. On January 5, 2007, the District Court sua sponte granted summary judgment for Stecko on Anchor's contribution claims against Stecko. Anchor did not oppose the summary judgment, as its expert had found no manufacturing defects in the Stecko valve components.[4] Anchor does not now

_____

[4] Stecko has filed an unopposed motion to file a surreply brief. That motion is granted.

23

appeal the grant of summary judgment in favor of Stecko.

Appellants argue, as they did before the District Court, that because their expert found a defect in the Stecko valve there was a genuine issue of material fact precluding the dismissal of Stecko because the jury could find that the Stecko valve was defective and caused the failure resulting in Meadows' injury. Appellants are here seeking to admit evidence against a party they did not sue in support of a claim abandoned by the party who raised it. Pursuant to Federal Rule of Civil Procedure 14, a plaintiff cannot recover against a third-party defendant unless the plaintiff amends his complaint and files a direct action against the third-party defendant. See Fed. R. Civ. P. 14(b); see also George v. Brehm, 246 F. Supp. 242, 246 (W.D. Pa. 1965). Here, despite being given an opportunity to do so, appellants failed to amend their complaint or to seek to amend their complaint out of time to bring an action against Stecko under Rule 14. We therefore need not consider whether the District Court should have taken Sokalski's testimony into account in granting summary judgment for Stecko against Anchor. Because we affirmed the Court's exclusion of Sokalski's testimony and appellants have not filed a claim against Stecko or amended their complaint to bring an action against Stecko, the issue is moot.

For the foregoing reasons, we affirm the judgment of the District Court in its entirety.

24