714 F.Supp.2d 535 (2010)
In re ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. IV).
Dianna K. Larson, et al.
v.
Bondex International, et al.
MDL Docket No. 875. E.D. PA Civil Action No. 09-69123. Transferor Court District of Utah (Central) 08-cv-00333.
United States District Court, E.D. Pennsylvania.
May 24, 2010.
*537 Julie L. Celum, Waters & Kraus LLP, Dallas, TX, Mark F. James, Hatch James Dodge, Salt Lake City, UT, Nathan D. Finch, Caplin & Drysdale, Chartered, Washington, DC, for Plaintiff.
Richard W. Pruett, Markusson Green Jarvis, P.C., Denver, CO, Timothy C. Houpt, Jones Waldo Holbrook & McDonough, John P. Ball, Jr., Katherine Venti, Nicole G. Farrell, Parsons Behle & Latimer, Salt Lake City, UT, Joshua D. Scheets, Marshall, Dennehey, Warner, Coleman & Goggin, P.C., James P. Hadden, Maron Marvel Bradley & Anderson PA, Kevin J. O'Brien, Marks, O'Neill, O'Brien & Courtney, P.C., Philadelphia, PA, for Defendant.

ORDER
M. FAITH ANGELL, United States Magistrate Judge.
AND NOW, this 24th day of May, 2010, after hearing argument on pending Daubert motions, and for the reasons stated in the accompanying memorandum, it is hereby ORDERED that:
(1) Defendant Georgia Pacific LLC's Motion To Exclude Testimony Of Plaintiffs' Experts Under Federal Rule Of Evidence 702 [Docket Entry No. 19] is DENIED.
(2) Defendant Bondex International, Inc., RPM, Inc., And RPM International, Inc.'s Motion To Strike The Testimony Of Experts Arnold R. Brody, Ph.D. And Jacques Legier, M.D. [Docket Entry No. 23] is DENIED. Consistent with Plaintiffs' representations, Dr. Brody's testimony at trial will be limited to general testimony about how asbestos causes cancer and may not include any opinion as to specific causation in this case.
(3) Plaintiffs' Motion In Limine To Exclude Or Limit Dose Reconstruction Testimony Pursuant To Daubert And Rules 702 And 703 Of The Federal Rules Of Evidence [Docket Entry No. 20] is DENIED. Dr. William L. Dyson will be permitted to testify as an expert industrial hygienist and may opine as to Dianna Larson's asbestos exposure dose and risk while working with joint compound as alleged.
(4) Plaintiffs' Motion In Limine To Exclude Or Limit Testimony Pursuant To Daubert And Rules 702 And 703 Of The Federal Rules Of Evidence [Docket Entry No. 25] is DENIED.

MEMORANDUM
Presently before this Court for decision are four motions challenging various experts. I held oral argument on all four Daubert motions on March 8, 2010. I will address the motions in the order in which they were argued.

*538 I. Background.
Plaintiff Dianna Larson was diagnosed with mesothelioma in 2006. Plaintiffs allege that the mesothelioma is the result of exposure to asbestos in joint compound products which Dianna Larson used in the 1970's when she and her first husband built two homes in Utah. Named Defendants are alleged to have manufactured, sold or distributed chrysotile-containing joint compound products.[1]
Plaintiffs allege that Dianna Larson and her first husband constructed the two homes from the ground up with virtually no outside assistance. According to Plaintiffs,
"[Dianna] Larson was regularly and frequently exposed to asbestos in the construction of both homes as a result of sanding down the asbestos containing joint compound products manufactured and/or distributed by Defendants that Ms. Larson and her husband used to sheetrock the walls and ceilings, being in the sites where her husband was working with asbestos containing products, cleaning up the sites where asbestos containing products were used, and washing her and her husband's asbestos exposed clothes."
Plaintiffs' Memorandum Of Law In Support Of Their Motion In Limine To Exclude Or Limit Dose Reconstruction Testimony Pursuant to Daubert and Rules 702 And 703 Of The Federal Rules Of Evidence [Docket Entry No. 20-2] at p. 3.[2]
Defendants dispute Dianna Larson's diagnosis[3] and further deny that her alleged exposure to chrysotile asbestos fibers contained in joint compound products caused or contributed to her mesothelioma. At oral argument, Defendants argued:
"There is a very real question about whether chrysotile causes peritoneal mesothelioma, which is the type of mesothelioma that Ms. Larson has. There is a very real question about whether Ms. Larson was ever exposed to a sufficient amount of chrysotile to have caused the disease." N.T. 3/8/10 at p. 9 (Argument on Defendant Georgia Pacific's Motion to Exclude Plaintiffs' causation experts, Dr. Brody and Dr. Legier).

II. Legal Standards.
The standard for admitting expert testimony is set forth in Federal Rule of Evidence 702, as interpreted by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. *539 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
Federal Rule of Evidence 702 provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."
Federal Rules of Evidence 702 (2000).
The Third Circuit has explained that "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [i.e., reliability]; and (3) the expert's testimony must assist the trier of fact [i.e., fit]." "Under the Federal Rules of Evidence, a trial judge acts as a gatekeeper to ensure than any and all expert testimony or evidence is not only relevant, but also reliable." United States v. Schiff, 602 F.3d 152, 172-73 (3d Cir.2010) (quoting Pineda v. Ford Motor Co., 520 F.3d 237, 243-44 (3d Cir.2008)).
The second requirement, reliability, is at issue in the present Daubert motions. The Third Circuit has recognized that
"[...] pursuant to the second requirement, `an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.' Paoli [R.R. Yard PCB Litigation], 35 F.3d [717] at 742 [(3d Cir.1994)] (citing Daubert, 509 U.S. at 589, 113 S.Ct. 2786). While a litigant has to make more than a prima facie showing that his expert's methodology is reliable, we have cautioned that `[t]he evidentiary requirement of reliability is lower than the merits standard of correctness.' Id. at 744; see also TMI, 193 F.3d at 665 (stating that `the standard for determining reliability is not that high, even given the evidentiary gauntlet facing the proponent of expert testimony under Rule 702' (internal quotation marks and citation omitted)); Kannankeril, 128 F.3d at 806 ('Admissibility decisions focus on the expert's method and reasoning; credibility decisions arise after admissibility has been determined.')."
Pineda v. Ford Motor Company, 520 F.3d 237, 247 (3d Cir.2008).
In evaluating whether a particular methodology is reliable, the inquiry is a flexible one to be tailored to the specific case. Factors drawn from Daubert and Third Circuit precedent which may be applicable include:
"(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. [citation omitted]"
Id. at pp. 247-48.

III. Analysis.

A. The Testimonies Of Dr. Legier And Dr. Brody Are Sufficient To Meet Rule 702 Reliability Requirements.

The Georgia Pacific, Bondex and Union Carbide Defendants seek to exclude the *540 testimony of Plaintiffs' causation experts, Jacques Legier, M.D. and Arnold R. Brody, Ph.D.[4] They argue that Dr. Brody, a cellular biologist, and Dr. Legier, a pathologist, have both opined that inhaled chrysotile fibers can cause peritoneal mesothelioma, and that these opinions are not supported by proper and accepted scientific evidence. According to the Defendants, "the overwhelming weight of authority demonstrates that chrysotile does not cause either type of peritoneal mesothelioma [either diffuse malignant peritoneal mesothelioma or well-differentiated papillary mesothelioma of the peritoneum]." Georgia Pacific's Daubert Motion at p. 4.

1. The Testimony of Dr. Arnold Brody.
With regard to Dr. Brody, Defendants assert that: (1) he is not qualified "to give an opinion as to the distinctions in causation between the competing diagnoses in this case," (2) his failure to recognize the distinction between the diagnoses is fatal to his causation opinions because "the distinction between well-differentiated papillary mesothelioma and diffuse malignant mesothelioma is crucial, both in terms of causation and prognosis," and (3) any opinions of Dr. Brody on the issue of causation or increased risk from exposure to joint compound are unreliable because Dr. Brody is unfamiliar with the exposures specifically alleged by Ms. Larson, he has undertaken no review of the literature to determine what level of exposure, if any, could be causally linked to Ms. Larson's particular condition, and he broadly opines that chrysotile exposures are causally related to mesothelioma generally but fails to distinguish specifically as to the product or manner of exposure and also fails to distinguish the disease at issue. Defendant Bondex International, Inc. And RPM International, Inc.'s Memorandum In Support Of Motion To Strike The Testimony Of Experts Arnold R. Brody, Ph.D. And Jacques Legier, M.D. [Docket Entry No. 23-2][5] at pp. 7-9. Defendant Georgia Pacific argues that Dr. Brody ignores "the available and published epidemiology" which is the "gold standard in proving causation." Georgia Pacific's Daubert Motion at p. 11.
With regard to the criticism that Dr. Brody is not qualified to give an opinion as to the distinctions in causation between the competing diagnoses, Plaintiffs respond by asserting that Dr. Brody's testimony is not being offered to establish what specifically caused Ms. Larson's cancer, "but rather to generally inform and educate the jury about how asbestos causes cancer. Plaintiffs intend for Dr. Brody to testify about the physiological design and function of the lungs, how asbestos fibers migrate throughout the body and are deposited in the lungs, the different types of asbestos fibers, and how all exposures to asbestos contribute to cause an individual's disease." Plaintiff's Memorandum In Opposition To Defendants' Motions To Strike And Exclude The Testimony Of Plaintiffs' Experts Drs. Jacques Legier And Arnold Brody [Docket Entry No. 43] at p. 21.[6] Consistent with Plaintiffs' representation, Dr. Brody's expert testimony at trial will be limited to general testimony about how asbestos causes cancer *541 and may not include any opinion as to specific causation in this case.
I have reviewed Dr. Brody's "expert report," and note that it is a generic document entitled "Asbestos Induced Lung Diseases." This document is not case specific and speaks broadly as to "four major diseases" caused by the inhalation of asbestos fibers. It is Dr. Brody's opinion that all of the asbestos fiber varieties (chrysotile, crocidolite and amosite) cause asbestosis, pleural fibrosis, lung cancer and mesothelioma. "Asbestos Induced Lung Diseases" by Arnold R. Brody, Ph.D. (attached as Exhibit "I" to Georgia Pacific's Daubert Motion) at p. 2.[7] In support of his opinion, Dr. Brody states:
"The basic cellular and molecular mechanisms through which asbestos causes the four diseases have been established at varying levels of knowledge through scientific investigations on humans and correlative animal and cell studies (see CV attached and references therein)."
Id.
Attached to Dr. Brody's report is his curriculum vitae in which he lists one hundred and forty-six "peer-reviewed publications," and approximately fifty chapters, of which Dr. Brody is an author or co-author. Many of these articles relate to how exposure to chrysotile fibers affects cells on a molecular level and include, for example, "Chrysotile Asbestos Inhalation In Rats; Deposition Pattern And Reaction Of Alveolar Epithelium And Pulmonary Macrophages," "Interstitial Accumulation Of Inhaled Chrysotile Asbestos Fibers And Consequent Formation of Microcalcifications," "Characterization Of Three Types Of Chrysotile Asbestos After Aerosolization," "Chrysotile Asbestos Inhalation Induces Tritiated Thymidine Incorporation By Epithelial Cells Of Distal Bronchioles," "Cellular And Molecular Bases Of The Asbestos-Related Diseases," and "Asbestos Fiber Type In Malignant Mesothelioma: An Analytical Scanning Electron Microscopic Study Of 94 Cases."[8]
I have little trouble concluding that Dr. Brody's methodology is reliable and meets the flexible Daubert criteria for admissibility. His opinions are supported by citations to various peer-reviewed articles, rest upon "good grounds," and are not simply "personal subjective opinions."[9]See Heller v. Shaw Industries, 167 F.3d 146, 152-53 (3d Cir.1999) ("even if the judge believes `there are better grounds for some alternative conclusion,' and that there are some flaws in the scientist's methods, if there are `good grounds' for the expert's conclusions, it should be admitted"). Any concerns about the lack of specific citations to support Dr. Brody's general causal assessment and the role cellular and molecular mechanisms should play in causation analyses may be aired on cross examination, and can be considered by the jury in assessing the weight which they assign to Dr. Brody's opinion. See Johnson v. Vane Line Bunkering, Civ.A. 01-5819, 2003 WL 23162433 at *8 (E.D.Pa. December 30, 2003) (noting, in rejecting a Daubert challenge for alleged failure to meet the reliability requirement, that "the Third Circuit does not require that an expert review every medical report available to him or her and does not require that a physician make citations to publications to support his medical conclusions. At most, the shortcomings alleged by defendant *542 render [plaintiff's expert's] opinion `shaky,' but admissible nonetheless. `[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence . . .' [quoting Heller, 167 F.3d at 152]").

2. The Testimony of Dr. Jacques Legier.
Defendants challenge the expert testimony of Dr. Jacques Legier as unreliable, arguing that it should be excluded because: (1) Dr. Legier did not write his own supplemental report, it was written by Plaintiffs' Counsel; (2) Dr. Legier's opinion that Dianna Larson was properly diagnosed with diffuse malignant mesothelioma of the peritoneum is "equivocal and as such is inherently suspect;" and (3) Dr. Legier's opinions contain fatal methodological flaws, his methodology is both personal and idiosyncratic, and his opinion is not based on proper scientific methodology. See Georgia Pacific's Daubert Motion at pp. 13-18; and Bondex's Daubert Motion at pp. 9-12.
As a preliminary matter, I find that Dr. Legier's failure to write his own supplemental expert report does not, under the circumstances of this case, violate Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. Rule 26(a)(2)(B) requires that an expert's testimony "be accompanied by a written reportprepared and signed by the witness." Fed.R.Civ.P. 26(a)(2)(B)(2007). As both parties acknowledge Rule 26(a)(2)(B) "does not preclude counsel from providing assistance to experts in preparing reports [. . .] Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and must be signed by the witness." Fed.R.Civ.P. 26 Advisory Committee Note (1993 Amendments).
When a Rule 26(a)(2)(B) challenge is raised, the proper focus of the court's inquiry is whether the expert witness "offered substantial input into what was put into the report." Crowley v. Chait, 322 F.Supp.2d 530, 544 (D.N.J.2004). In this case, Dr. Legier testified at deposition that while he did not write his supplemental report, he agreed with the content of the report. Exhibits to Plaintiffs' Opposition to Defendants' Daubert Motions [Docket Entry No. 48]: Exhibit "6" (Deposition of Dr. Jacques Legier) at pp. 14-16. In addition, Dr. Legier has submitted a "Declaration," notarized on November 30, 2009, in which he attests that his supplemental report "is based on personal knowledge and [his] professional experience in the field of Occupational Medicine." Id.: Exhibit "46" (Declaration of Dr. Jacques Legier). While Dr. Legier does not have a specific recollection of discussing his supplemental report with Plaintiffs' attorneys before he reviewed the supplemental report and signed it, he
"[has] discussed the topics in the [supplemental] report and the literature cited concerning on [sic] general and specific causation involving chrysotile asbestos exposure and pleural and peritoneal mesothelioma with Waters & Kraus attorneys on many occasions. The [supplemental] report summarizes [his] opinions as [he has] relayed them to the Waters & Kraus attorneys in this and many other cases. [He] agreed with all of the statements in the [supplemental] report and although an attorney from Waters & Kraus may have typed the document, the opinions and the bases therefore are [his] alone."
Id. Dr. Legier's Declaration, the veracity of which I have no reason to question, reflects the fact that he was sufficiently involved in the preparation of the supplemental report that this document may be *543 considered as setting forth Dr. Legier's opinions and not those of counsel. See Crowley, 322 F.Supp.2d at pp. 544-45 (D.N.J.2004) (holding, where counsel organized the expert's opinions and wrote his report after discussion with the expert, that "while the type of assistance rendered by [counsel] in the compilation of this report may approach the limits of what Rule 26(a)(2)(B) will allow, it does not run afoul of those limits.").
Dr. Legier personally reviewed Dianna Larson's medical records and concluded "with a reasonable degree of medical certainty and medical probability, that Mrs. Larson has a low-grade malignant epithelial mesothelioma of the peritoneum, with partial features of papillary well-differentiated mesothelioma, which, on the basis of her occupational history, was caused by her occupational exposure to asbestos." August 14, 2008 Surgical Pathology Report of Dr. Legier (attached as Exhibit "L" to Georgia Pacific's Daubert Motion) at p. 2.
The Third Circuit has recognized differential diagnosis as a reliable methodology. Heller, 167 F.3d at 154 (3d Cir. 1999) ("Both a differential diagnosis and a temporal analysis, properly performed, would generally meet the requirements of Daubert and Paoli"). Therefore, I reject the argument that differential diagnosis is "inherently suspect."
As with Dr. Brody, I have little difficulty concluding that Dr. Legier's opinions rest upon "good grounds." In the supplemental report, Dr. Legier opines that it is
"widely accepted in the scientific and medical community that both mesothelioma, including peritoneal mesothelioma, can be caused in humans by exposure to asbestos, including chrysotile asbestosis. [. . .] The consensus of the medical and scientific community supports the conclusion that both pleural and peritoneal mesothelioma are signature diseases caused by exposure to asbestos, including chrysotile asbestos."
Supplemental Expert Report of Jacques Legier, M.D. (dated April 24, 2009 and attached as Exhibit "L" to Georgia Pacific's Daubert Motion) at p. 2.
In support of this opinion, Dr. Legier cites inter alia:
(1) peer-reviewed medical literature linking chrysotile fibers with peritoneal mesothelioma;
(2) case reports of individuals who suffered peritoneal mesothelioma and were exposed to chrysotile fibers;
(3) animal injection studies which show that chrysotile fibers placed in direct contact with the peritoneum have the capacity to cause malignant changes in the mesothelial cells;
(4) fiber migration studies which demonstrate that inhaled chrysotile fibers reach the peritoneum in insulation workers exposed to chysotile and amosite fibers; and
(5) a review of epidemiological evidence by Dr. Paulo Boffetta in which he found that studies of workers exposed only to, or predominantly to, chrysotile fibers resulted in a lower proportion of total deaths than studies of workers exposed to amphibole or mixed type of asbestos.
Id. at pp. 2-5.
Defendants argue that although Dr. Legier's supplemental report "has features of various scientific methods, they have been used in incomplete and misleading ways. [. . .] His reliance on case reports or case series, animal studies, and fiber migration studies, while ignoring relevant epidemiological studies, is contrary to the reliability requirements set forth in Rule 702 and Daubert and its progeny." Georgia Pacific's Daubert Motion at pp. 16-17.
In the Third Circuit, a medical expert does not always need to cite published *544 studies on general causation in order to reliably conclude that a particular object caused a particular illness. Epidemiology studies are not per se required, and may not be needed, if an expert offers a reliable causation opinion through the use of some other valid scientific methodology. Heller v. Shaw Industries, 167 F.3d at pp. 155-56 (3d Cir.1999).
Dr. Legier did not ignore relevant epidemiological studies. He notes a consensus that the predominant cause of peritoneal mesothelioma is exposure to asbestos and opines that "there are no studies that link a specific fiber typechrysotile, amosite, crocidolite or tremoliteto the occurrence of peritoneal mesothelioma in a statistical format because of the combination of the extreme rarity of peritoneal mesothelioma and the lack of any significant cohort of workers who were exposed to only one type of asbestos." Supplemental Expert Report of Jacques Legier, M.D. (dated April 24, 2009 and attached as Exhibit "L" to Georgia Pacific's Daubert Motion) at p. 5. Defendants' experts disagree, however, this does not negate the fact that Dr. Legier's opinions are based on generally accepted scientific methods and procedures, and that he gave a reasoned explanation for his preferred methodology. Defendants are free to argue credibility to the jury.[10]

B. The Dose Reconstruction Testimony of Dr. Dyson Is Sufficiently Relevant And Reliable To Meet Rule 702 Requirements.

Plaintiffs seek to exclude testimony by any defense expert (including but not limited to William L. Dyson) relating to dose reconstruction. Plaintiffs argue that Dr. Dyson's dose reconstruction testimony to estimate the total exposure of an individual, rather than the average exposure of a group, is unreliable. Plaintiffs' Reply In Support Of Their Motion In Limine To Exclude Or Limit Dose Reconstruction Testimony Pursuant To Daubert And Rules 702 and 703 Of The Federal Rules Of Evidence [Docket Entry No. 53][11] at p. 4. Specifically, Plaintiffs
"agree that dose reconstruction assessment studies may be admissible in certain situations to provide reference ranges or data points of the average exposures of a group or cohort of persons with similar asbestos exposure histories. Plaintiffs ask only that this Court preclude Defendants from offering any testimony as to a purported numerical value of the total dose of asbestos to which Ms. Larson was exposed, or a range of exposure numbers that are meant to replicate any particular exposure of Ms. Larson's, because given the complete lack of competent data, any such figures are inherently speculative and unreliable, and thus fail to satisfy the standards for admissibility under Daubert and the Federal Rules of Evidence."
Id. at pp. 2-3.[12]
Plaintiffs do not challenge dose reconstruction methodology per se, instead they argue that there is not a good fit between this methodology and the facts of this case, and that there is no data to support Dr. *545 Dyson's estimation of Ms. Larson's total exposure. Id. at pp. 5-6 and N.T. 3/8/10 at p. 114 ("[ . . .] not only must an expert employ sound methodology, but there must be a good fit between the methodology the expert attempts to employ and the facts of the case. [. . .] We have good qualitative evidence of exposure. Ms. Larson, in a qualitative manner explained the nature of her exposure in breathing the dust. We just don't have the quantification that would be necessary for Dr. Dyson to do this.").
Defendants offer Dr. Dyson as an expert industrial hygienist who will testify as to Ms. Larson's potential exposure to asbestos while working with joint compound as alleged. They argue that in making his calculations Dr. Dyson relied upon information provided by Plaintiffs in answers to discovery, medical reports and deposition testimony, and on multiple studies regarding the use of joint compound and exposure levels of asbestos. "With this information, combined with Dr. Dyson's knowledge, experience and education, he opines as to potential exposure dose." Memorandum In Opposition To Plaintiffs' Motion In Limine To Exclude Or Limit Dose Reconstruction Testimony Pursuant To Daubert and Rules 702 and 703 Of The Federal Rules Of Evidence And Joinder In Responses To Same Submitted By Defendants Union Carbide And/Or Georgia Pacific[13] at pp. 6-7.
Dr. Dyson's dose reconstruction testimony may assist the trier of fact in determining causation and, therefore, meets the "fit" requirement of Rule 702. See Meadows v. Anchor Longwall, et al., 306 Fed. Appx. 781, 790 (3d Cir.2009) ("The third element under Rule 702, namely, whether the expert testimony would assist the trier of fact, `goes primarily to relevance.' The expert's testimony must `fit' under the facts of the case so that `it will aid the jury in resolving a factual dispute.' The standard for the factor is not high; it is met when there is a clear `fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case. [citations omitted]").
In addition, Dr. Dyson's dose reconstruction assessments are based on a sufficient foundation. When it is impossible to calculate actual exposure levels, the mere fact that an expert makes reasonable calculations to support his opinion is not enough to render that opinion unreliable. Dr. Dyson, using his knowledge and experience, applied an accepted methodology to information garnered from Ms. Larson's medical records, deposition testimony and answers to discovery requests, and reached conclusions that reliably flow from the available data and methodology. To the extent that Defendants believe that Dr. Dyson's calculations are based on inaccurate evidence or otherwise are in error, such concerns can be addressed through cross-examination and/or rebuttal evidence. However, they do not provide a basis for finding his opinions unreliable within the meaning of Rule 702.

C. The Testimony Of Defendants' Causation Experts Are Sufficient To Meet Rule 702 Reliability Requirements.

Plaintiffs have moved to exclude testimony from any of Defendants' experts regarding the following opinions:
"(1) the quantification of asbestos fiber potency, including any opinions made in reliance on the risk assessment of Hodgson *546 and Darnton, one of the various iterations of the Berman & Crump risk assessment, or the similar Brattin & Crump quantitative risk assessment model; (2) the alleged inability of chrysotile asbestos to cause pleural or peritoneal mesothelioma; and (3) that there is any `safe level' or `threshold dose' of asbestos exposure, below which such exposures cannot cause mesothelioma."
"Plaintiffs' Reply In Support Of Plaintiffs' Motion In Limine To Exclude Or Limit Testimony Pursuant To Daubert and Rules 702 And 703 Of The Federal Rules Of Evidence" [Docket Entry No. 56][14] at p. 2.
In support of their Daubert motion, Plaintiffs argue that (1) there is no reliable data upon which to base a quantification of the relative potency of chrysotile asbestos[15], (2) the consensus of the scientific community is that chrysotile asbestos is capable of causing peritoneal mesothelioma[16]; and (3) testimony that there is a safe or threshold level of asbestos has no reliable basis.[17]Id. at pp. 5-22.
In response, Defendants allege that testimony of differing potencies of types and sizes of asbestos fibers, of the inability of chrysotile to cause mesothelioma, and of a minimum level of asbestos exposure below which there is no evidence that such exposure causes disease
"is routinely admitted in asbestos litigation across the nation. The science behind these issues is well established. Plaintiffs have done nothing more than cherry pick out of thousands of research materials on the subject to dispute these positions. However, noting in F.R.E. 702 or any Daubert analysis requires an expert's opinion to be wholly without dispute anywhere in the worldwide scientific community."
"Memorandum In Opposition To Plaintiffs' Motion In Limine To Exclude Or Limit Testimony Pursuant to Daubert And Rules 702 And 703 Of The Federal Rules Of Evidence And Joinder In Responses To Same Submitted By Defendants Union Carbide And/Or Georgia Pacific Corporation" [Docket Entry No. 30][18] at p. 2.
Having reviewed Defendants' causation experts' reports, I conclude that they used valid scientific methodology, citing to peer-reviewed scientific studies, in reaching their conclusions regarding the varying potency of different asbestos fiber types, the lack of a causal link between chrysotile and peritoneal mesothelioma, and the concept of a threshold level of asbestos exposure. The fact that Plaintiffs can cite other studies which challenge the studies relied upon by Defendants' causation experts does not render their opinions unreliable. See Johnson v. Vane Line Bunkering, 2003 WL 23162433 at *6 (E.D.Pa. December 30, 2003) ("`Daubert *547 does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology. Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined.' Kannankeril, 128 F.3d at 806. If disagreements on particular points between proposed experts and others in their field were a proper basis for questioning the reliability and relevance of the methods employed by the experts, it is likely that very few expert opinions would be admissible at trial.").

IV. Conclusion.
Having heard oral argument on the Daubert motions, and having reviewed the various pleadings and exhibits, I find that the relative positions of the parties can be summarized in one sentence: "the opinions of my experts are reliable because they're mine and yours aren't because they're yours." See Crowley v. Chait, 322 F.Supp.2d at p. 552 (D.N.J.2004). Each of the challenged experts' testimonies meet the admissibility requirements under Rule 702. "If this test is met and the expert's testimony is [. . .] admissible, it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of [the] competing experts' opinions should be credited. The ultimate determination of whether expert testimony is correct and `reliable' in this sense remains with the jury." Cook v. Rockwell International Corp., 580 F.Supp.2d 1071, 1085 (D.Colo.2006). See Heller, 167 F.3d at p. 157 (3d Cir.1999) ("[W]e have emphasized that the district court should take care not to `mistake credibility questions for admissibility questions.'").
NOTES
[1] This case was originally filed in 2007 in the District Court of Harris County Texas. It was voluntarily dismissed and in March 2008, Plaintiffs re-filed their case in the Third Judicial District Court, Salt Lake County, Utah. The action was then removed to the United States District Court, District of Utah and transferred to the MDL in June 2008. Fact-based and expert discovery has been completed in this forum. Defendant Georgia-Pacific LLC's Memorandum To Exclude Testimony of Plaintiffs' Experts Under Rule Of Evidence 702 and Request for Hearing [Docket Entry No. 19] at pp. 2-3. [Hereinafter "Georgia Pacific's Daubert Motion."]
[2] Hereinafter "Plaintiffs' Dose Reconstruction Daubert Motion."
[3] The dispute centers on whether Dianna Larson has diffuse malignant mesothelioma of the peritoneum or well-differentiated papillary mesothelioma. According to Plaintiffs, Ms. Larson's treating pathologists "favor a diagnosis of malignant mesothelioma, specifically well differentiated epithelial mesothelioma." Plaintiffs' Dose Reconstruction Daubert Motion at p. 3 n. 2. Defendants' expert, Gary R. Epler, opines that Dianna Larson's correct diagnosis is peritoneal well-differentiated papillary mesothelioma. Expert Report of Gary R. Epler, attached to Plaintiffs' Motion In Limine To Exclude Or Limit Testimony Pursuant To Daubert And Rules 702 And 703 Of The Federal Rules Of Evidence at Docket Entry No. 25-18 at p. 4.
[4] Defendant Union Carbide joined in Daubert motions filed by the Georgia Pacific and Bondex Defendants. See Docket Entry No. 24 ("Defendant Union Carbide Corporation's Joinder in Georgia-Pacific LLC and Bondex International's Motions filed on November 4, 2009").
[5] Hereinafter "Bondex's Daubert Motion."
[6] Hereinafter "Plaintiffs' Opposition to Defendants' Daubert Motions."
[7] See Docket Entry No. 19-12.
[8] These articles are listed as Nos. 32, 34, 42, 78, 93, and 102 on Dr. Brody's curriculum vitae.
[9] See Expert Report of Douglas L. Weed (attached as Exhibit "D" to Georgia Pacific's Daubert Motion) at p. 17.
[10] To the extent that the Defendants argue that the testimony of Plaintiffs' experts is not sufficient to prove causation, this is a separate question from the threshold question of admissibility of expert evidence.
[11] Hereinafter "Plaintiffs' Dose Reconstruction Daubert Reply Brief."
[12] At oral argument, Plaintiffs' Counsel argued: "If Dr. Dyson wants to come in and testify that he has reviewed the exposure, and it's not enough, that's one thing. For Dr. Dyson to come and put a number on what he believes that exposure is, is quite another." N.T. 3/8/10 at p. 132.
[13] Hereinafter "Bondex's Opposition To Plaintiffs' Dose Reconstruction Daubert Motion."
[14] Hereinafter "Plaintiffs' Reply Brief In Support of Causation Daubert Motion."
[15] According to Plaintiffs' "although testimony regarding the existence of a potency difference may be admissible, testimony regarding any purported quantification of the relative potency of chrysotile is unreliable because the data necessary to perform such quantifications simply does not exist." Id. at p. 5.
[16] Plaintiffs contend "[t]here is an ample amount of peer reviewed medical literature and other reliable sources that support the proposition that chrysotile can cause peritoneal mesothelioma." Id. at p. 16.
[17] Plaintiffs argue that "[b]ecause the science is so well established that very brief, minimal asbestos exposures can and do cause mesothelioma, the law almost everywhere is that any identifiable exposure to asbestos is sufficient to support specific causation in a mesothelioma case." Id. at p. 20.
[18] Hereinafter "Bondex' Response To Plaintiffs' Causation Daubert Motion."