**James R. WITHROW, Plaintiff,**

v.

**John H. SPEARS, and Trucks on the Run, Jointly and Severally, Defendants/Third Party Plaintiffs,**

v.

**State Farm Fire and Casualty Company, Third Party Defendant.**

**Civil Action No. 12–06–LPS–CJB.**

United States District Court, D. Delaware.

Aug. 22, 2013.

Bernard A. Van Ogtrop, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE, Kevin A. Guerke, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE, for Plaintiff.

Daniel L. McKenty, Heckler & Frabizzio, Wilmington, DE, Katherine Lindsay Hemming, Maron Marvel Bradley & Anderson LLC, Wilmington, DE, Michael James Logullo, Heckler & Frabizzio, Wilmington, DE, for Defendants/Third Party Plaintiffs.

Colin M. Shalk, Casarino, Christman & Shalk, P.A., Wilmington, DE, Michael James Logullo, Heckler & Frabizzio, Wilmington, DE, for Third Party Defendant.

### *MEMORANDUM ORDER*

CHRISTOPHER J. BURKE, United States Magistrate Judge.

Pending before the Court in this personal injury case is Plaintiff James R. Withrow's ("Plaintiff" or "Withrow") *Daubert* motion ("*Daubert* Motion") to exclude opinions and testimony of John A. Desch, P.E., an accident reconstruction expert hired by Defendants John H. Spears ("Spears") and Trucks on the Run (collectively, "Defendants"). (D.I. 47) Also pending is Plaintiff's motion to strike the expert reply report of Defendants' expert Robert T. Bove, Ph.D. ("Motion to Strike"). (D.I. 41)[1] For the following

---

1. Our Court has treated *Daubert* motions as non-dispositive motions, which may be resolved by the Court pursuant to 28 U.S.C. § 636(b)(1)(A) and D. Del. LR 72.1(a)(2). *See, e.g., McKesson Automation, Inc. v. Swisslog Italia S.P.A.*, 712 F.Supp.2d 283, 293 (D.Del.

reasons, the Court GRANTS–IN–PART Plaintiff's *Daubert* Motion and DENIES Plaintiff's Motion to Strike.

## I. BACKGROUND

### A. Factual Background

This case arises from a collision that occurred on November 4, 2011, when a tractor-trailer driven by Spears and owned by Trucks on the Run hit Withrow's vehicle. (D.I. 1, ex. A at ¶ 7; D.I. 48, ex. 1 at 2) The collision occurred at approximately 5:00 a.m. on Route 1 in Delaware, when the tractor-trailer struck Plaintiff's car door. (D.I. 44 at 1; D.I. 48, ex. 1 at 2) A portion of Plaintiff's left hand, including two fingers and a thumb, was severed in the collision. (D.I. 48 at 1 & ex. 1 at 4) At the time of the collision, Plaintiff was parked on the shoulder of Route 1. (D.I. 42 at 1; D.I. 48, ex. 1 at 4)

### B. Procedural Posture

On November 28, 2011, Plaintiff commenced this action in the Superior Court of the State of Delaware. (D.I. 1 at ¶ 1) On January 3, 2012, Defendants removed the action to this Court. (D.I. 1) On March 8, 2012, Judge Leonard P. Stark entered a Scheduling Order in the case, (D.I. 13), and on April 6, 2012, Judge Stark referred the action to the Court to hear and resolve all pretrial matters, up to and including the resolution of case dispositive motions (D.I. 15). Defendants later filed a third party complaint on November 15, 2012 against Third Party Defendant State Farm Fire & Casualty Co. (D.I. 30) The Court issued an amended Scheduling Order on November 16, 2012. (D.I. 29)

The amended Scheduling Order called for (1) the party with the initial burden of proof on the subject matter to disclose expert testimony by November 9, 2012; (2) for a supplemental expert disclosure to contradict or rebut evidence on that subject matter to be disclosed by December 21, 2012; and (3) for reply expert reports from the party with the initial burden of proof to be submitted by January 19, 2013. (D.I. 29, ex. B at ¶ 3(f)(i)) Defendants produced the expert report of accident reconstruction expert Mr. Desch (the "Desch Report") on November 8, 2012. (D.I. 48 at 1) Plaintiff retained a rebuttal accident reconstruction expert, George C. Govatos, Ph.D., P.E., and submitted his report to Defendants (the "Govatos Rebuttal") on February 1, 2013.[2] (*Id.*) Defendants then produced two separate reply expert reports. (*Id.*) The first report was written by Mr. Desch (the "Desch Reply"), the second by Dr. Bove, who is a biomechanical engineer (the "Bove Reply").[3] (*Id.*)

2010); *In re Rosuvastatin Calcium Patent Litig.*, MDL No. 08–1949, 2009 WL 4800702, at *1, *8 (D.Del. Dec. 11, 2009). The Motion to Strike is similarly not case-dispositive. *See, e.g., Wyeth Holdings Corp. v. Sandoz, Inc.*, Civ. Action No. 09–955–RGA–CJB, 2012 WL 1669555, at *1 (D.Del. May 10, 2012). This is in line with decisions of other courts in this Circuit, which have also treated such motions as non-dispositive, at least where the decisions were not determinative of a party's claims (just as they are not here). *See, e.g., Hawkins v. Waynesburg Coll.*, Civil Action No. 07–5, 2007 WL 2119223, at *1 n. 1 (W.D.Pa. July 20, 2007); *Reedy v. CSX Transp., Inc.*, Civil Action No. 06–758, 2007 WL 1469047, at *1 n. 1 (W.D.Pa. May 18, 2007).

2. This filing came after the deadline for submission for rebuttal expert reports in the then-binding version of the Scheduling Order, but only because Defendants had agreed to permit Plaintiff an extension of time to file the Govatos Rebuttal. (D.I. 44 at 4; D.I. 63 (hereinafter "Tr.") at 57)

3. Prior to Defendants' filing of the Bove Reply, in February 2013, Plaintiff objected to that filing on various grounds. In resolving that dispute in a telephonic conference, the Court, which had not yet been provided with a copy of the Bove Reply, ruled that the report could be filed. (D.I. 38 at 12) However, the Court's ruling was limited to the basis that it was not *per se* impermissible for Defen-

Plaintiff filed its Motion to Strike on April 12, 2013 and its *Daubert* Motion on May 1, 2013. (D.I. 41, 47) The Court held oral argument on the fully briefed motions on July 2, 2013. (D.I. 63)

A pretrial conference is scheduled for October 16, 2013, and trial is to begin on November 4, 2013. (D.I. 64)

### C. Content of the Expert Reports

As they are relevant to the issues described below, the Court briefly summarizes the content of the Desch Report, the Govatos Rebuttal, the Desch Reply and the Bove Reply.

#### 1. Desch Report

The first ten and a half pages of the Desch Report contain introductory information, a summary of evidence relating to the accident, a description of Mr. Desch's on-site inspection of the accident scene on November 4, 2011 and a summary of the damage to both vehicles. (D.I. 42, ex. A at 1–11) The next five pages comprise Mr. Desch's "accident analysis," the purpose of which is "to determine from the available information including physical evidence and driver testimony as to how and why the collision occurred and determine other aspects of the collision event that may be unknown or in dispute." (*Id.* at 11; *see also id.* at 11–17) Near the end of the report is a paragraph in which Mr. Desch concludes that Withrow violated a particular Delaware motor vehicle law. (*Id.* at 16)

In the "accident analysis" section, *inter alia*, Mr. Desch examines Withrow's prior statement that, at the time of collision, his hand was on the interior door handle of his car's front driver's side door, and concludes that the statement is inconsistent with the physical evidence. (*Id.* at 13) According to the report, this is because, had Withrow's hand been on the door handle as he claimed, then: (1) his hand would not have been damaged in the way that it was (i.e., because his thumb, index and middle fingers, which were shorn off in the accident, would not have been directly exposed to the tractor-trailer); and (2) the interior liner of the door "would have been directly involved in the collision and would have show[n] contact damage," when in fact it did not. (*Id.*) Mr. Desch concludes that, based on the nature of the damage to the car and Withrow's injuries, if Withrow was seated at the time of impact (as he claimed), then Withrow had to have been holding the outer edge of the door frame at that moment. (*Id.* at 14)

Mr. Desch also discusses the "bow-wave" theory in this section of the report. (*Id.* at 13–14) He explains that large vehicles, such as tractor-trailers, create a "bow wave" when traveling at a high rate of speed, and that, here, this effect caused the tractor-trailer to push air forward as it passed Withrow's car. (*Id.*) As it did so, Mr. Desch concludes, the air being pushed forward "acted like a ram" and forced the partially open car door to open further prior to impact. (*Id.* at 14) He concludes that this "bow wave" effect contributed to the circumstances leading to the accident. (*Id.*; *see also id.* at 15)

#### 2. Govatos Rebuttal

The Govatos Rebuttal, produced by Plaintiff, begins with a short summary of

---

dants to utilize a different expert in filing a reply report (Dr. Bove) than the expert who filed an initial report (Mr. Desch). (*Id.* at 12–13) As the Court did not have the benefit of reviewing the content of the Bove Reply at the time, it made no decision as to whether the Bove Reply exceeded the scope of a proper reply report, or could be challenged as improper under Rule 702. (*Id.* at 12–16 (Court noting that such a reply report would be permissible if it "is timely and is narrowly focused on responding to the content of the rebuttal report"))

the relevant evidence regarding the accident. (D.I. 42, ex. B. at 1–2) Next, it notes that "a portion of [Mr. Desch's] report discusses airflow around the Spears tractor-trailer, and how that airflow affected this collision" and states that Dr. Govatos has been asked "to examine that part of Mr. Desch's report and provide you with my comments regarding his analysis on this point." (*Id.* at 2) After a few paragraphs in which it summarizes deposition testimony and the Desch Report's content regarding the nature of the collision and Withrow's hand position, the remaining five pages of the Govatos Rebuttal focus on the "bow wave" theory. (*Id.* at 2–7) It utilizes analysis and visual aids to address and rebut Mr. Desch's conclusion as to whether the air flowing from a tractor-trailer would serve to push a nearby car door open further as the tractor-trailer passed. (*Id.* at 3–8) Instead, Dr. Govatos concludes that the airflow around the tractor-trailer would have tended to push the door closed rather than pull it open. (*Id.* at 8)

### 3. Desch Reply

The Desch Reply, produced by Defendants, notes that the Govatos Rebuttal was "critical of our determination as to how the partially open door came in contact with the side of the tractor trailer" but states that "[w]hat is interesting in the Govatos report is the lack of explanation by Mr. Govatos as to how he believes [ ] Withrow was injured, where [ ] Withrow was positioned relative to his vehicle and where [ ] Withrow's hand was when his fingers were severed." (D.I. 42, ex. C at 1) After some discussion of Dr. Govatos' conclusions as to how the "bow wave" theory would have applied to this accident, (*id.* at 1–3), Mr.

Desch described a new test that he conducted after receiving the Govatos Rebuttal (the "Mock–Up Test") to determine whether Govatos' "hypothesis . . . is accurate," (*id.* at 2–3).

In this Mock–Up Test, Mr. Desch "conducted actual testing along an interstate highway with a dual-hinge mock-up of a car door" in which "testing was conducted with the hinged 'door' partially opened at different angles in order to determine the effect of passing tractor trailers on our stationary door surrogate." (*Id.*) This mock-up or surrogate door consisted of foam board like that bought from an art supply store, taped together and connected to a pillar with a fence hinge, which was then placed on the shoulder of a roadway in New Jersey. (D.I. 48 at 7 & ex. 4 at 157–163)[4] Mr. Desch examined how the mock-up door reacted when various tractor-trailers sped by along the roadway (noting how, at times, the mock-up was pushed forward by the air flow from the trucks, or at others, how it remained in place or moved backward, then forward as the trucks passed). (D.I. 42, ex. C at 3) He explained how the testing was limited "by the proximity to the travel lane edge in that we were not on or over the fog line." (*Id.*) No measurements were taken as part of the testing. (D.I. 48 at 7 & ex. 4 at 159–169)

The Desch Reply goes on to criticize Dr. Govatos' conclusion that Withrow's car door was being pushed inward at the time of collision and to reiterate aspects of Mr. Desch's conclusions about Withrow's likely hand placement and the position of his car door prior to and at the point of impact. (D.I. 42, ex. C at 3–5)

---

**4.** Mr. Desch asserted during his deposition that the mock-up door was the same general size and dimensions of the actual door of Withrow's car (which Plaintiff disputes), but that it did not weigh the same as Withrow's door. (D.I. 48 at 7 & ex. 4 at 160) A video of this testing was provided to the Court at oral argument as Plaintiff's Exhibit 1. (Tr. at 14)

#### 4. Bove Reply

The Bove Reply, also produced by Defendants, asserts that it was "prepared ... in response [to the Govatos Rebuttal]." (D.I. 42, ex. D at 1) It also begins with an overview of the evidence regarding the accident. (*Id.* at 2–4) Next, it includes a four-page "[b]iomechanical [a]nalysis" that evaluates the accident from "a biomechanical perspective" as to Withrow's hand and body position at the time of the collision. (*Id.* at 4) Dr. Bove states that the nature of the injuries indicate that Withrow's hand was "interposed" between two contacting surfaces, which led to the severing of his three fingers. (*Id.* at 5) Dr. Bove relies on Mr. Desch's analysis in concluding that if Withrow's hand had in fact been on the interior door handle, he would not have sustained the injuries that he did. (*Id.*) Dr. Bove then describes various possibilities for the hand and body position of Withrow, and Dr. Bove's use of "surrogates" to simulate various accident scenarios. (*Id.* at 6–8) Ultimately, he concludes that Withrow's hand was at the rear portion of the fully open door when he sustained the injuries, and that at that time, at least one of Withrow's legs was outside the vehicle and Withrow was not wearing a seatbelt. (*Id.*)

On the last page of the Bove Reply, there is again reference to the Govatos Rebuttal. There, Dr. Bove notes that the Govatos Rebuttal discussed the "bow wave" theory, but that it did "not offer any alternative explanation for the finding that contact between the door and the tractor trailer was initiated at the rear portion of the trailer nor does he offer any mechanism to explain the injuries sustained by [ ] Withrow." (*Id.* at 8) He states that if Withrow was positioned at the time of impact in the manner Dr. Bove posits, it is "unclear how the flow field described by Dr. Govatos would interact with a door and

occupant in this position." (*Id.*) Lastly, Dr. Bove concludes that if the door of Withrow's vehicle were being pushed closed (as Dr. Govatos hypothesized) at the time of impact, this "would not provide a mechanism" to cause Withrow's injuries or the damages sustained to his car's door. (*Id.*)

### II. *DAUBERT* MOTION

#### A. Standard of Review

Federal Rule of Evidence 702 governs the admissibility of qualified expert testimony, providing that an expert witness may testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702. Rule 702's requirements have been examined in detail by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and have been said to embody "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir.2000) (citing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741–43 (3d Cir. 1994)); *see also B. Braun Melsungen AG v. Terumo Med. Corp.,* 749 F.Supp.2d 210, 222 (D.Del.2010).

In terms of expert qualifications, an inquiry under Rule 702 must address whether the expert witness has " 'specialized knowledge' regarding the area of testimony." *Elcock,* 233 F.3d at 741 (quoting *Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir.1998)). The basis of this specialized knowledge may be "practical experience as

well as academic training and credentials." *Id.* (internal quotation marks and citation omitted). At a minimum, however, "a proffered expert witness must ... possess skill or knowledge greater than the average layman." *Id.* (internal quotation marks and citation omitted). The United States Court of Appeals for the Third Circuit has tended to apply this standard liberally. *Id.*; *see also Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003).

■ With regard to the second requirement of reliability, Rule 702 mandates that the relevant expert testimony "must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786; *see also Schneider,* 320 F.3d at 404. The information provided by experts should be "ground[ed] in the methods and procedures of science" and be "more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786; *see also Schneider,* 320 F.3d at 404.[5] In examining this requirement, a court's focus must be on "principles and methodology" rather than on the conclusions generated by the expert. *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786; *see also Schneider,* 320 F.3d at 404.

■ The third requirement of expert testimony, the "fit" requirement, "goes primarily to relevance" as the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and have "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786; *see also Schneider,* 320 F.3d at 404. The standard for fit, however, is not a high one; it is met "when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Meadows v. Anchor Longwall & Rebuild, Inc.,* 306 Fed.Appx. 781, 790 (3d Cir.2009) (quoting *Lauria v. Amtrak,* 145 F.3d 593, 600 (3d Cir.1998)).

■ Overall, "Rule 702 embodies a 'liberal policy of admissibility.'" *B. Braun Melsungen AG,* 749 F.Supp.2d at 222 (quoting *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir.2008)). Nonetheless, the burden is placed on the party offering expert testimony to show that it meets each of the standards for admissibility. *Id.* (citing *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786).[6]

---

**5.** The United States Supreme Court later held in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), that the obligations imposed by *Daubert* extended to not only scientific expert testimony but rather to all expert testimony. *Kumho Tire Co.,* 526 U.S. at 147, 119 S.Ct. 1167.

**6.** Although Plaintiff requested oral argument on its *Daubert* Motion (which the Court held), (D.I. 58), neither party sought an evidentiary hearing on the motion. The Third Circuit has held that a trial court need not conduct an evidentiary hearing on a *Daubert* challenge if the record is sufficient to allow the Court to make a determination on the issues in dispute. *See, e.g., Oddi v. Ford Motor Co.,* 234 F.3d 136, 151–55 (3d Cir.2000); *Maldonado v. Walmart Store No. 2141,* Civil Action No. 08–3458, 2011 WL 1790840, at *13 n. 10

(E.D.Pa. May 10, 2011). Here, the respective Desch expert reports were provided to the Court, and they directly addressed the basis of Mr. Desch's conclusions. The parties also fully addressed those issues at oral argument. Moreover, the parties further supplemented the record with the full transcript of Mr. Desch's deposition testimony, Mr. Desch's *curriculum vitae,* and videotape evidence of Mr. Desch's Mock–Up Test. Under such circumstances, the Court has determined that the record before it is sufficient to allow for decision of the admissibility of Mr. Desch's testimony under *Daubert. See, e.g., Furlan v. Schindler Elevator Corp.,* 516 Fed.Appx. 201, 205–206 (3d Cir.2013); *Oddi,* 234 F.3d at 151–55; *Maldonado,* 2011 WL 1790840, at *13 n. 10; *Kerrigan v. Maxon Indus.,* 223 F.Supp.2d 626, 634 (E.D.Pa.2002).

## B. Legal Discussion

### 1. Mr. Desch's Testimony on Withrow's Hand and Body Position at the Time of the Accident and How Withrow's Hand Injuries Occurred

■ Plaintiff first argues that Mr. Desch lacks the requisite qualifications to opine as to Withrow's hand position or body position at the time of the accident, or as to the cause of Withrow's hand injuries, due to his lack of expertise in the field of biomechanics. (D.I. 48 at 15–17) Mr. Desch is a licensed professional engineer, accredited in four states. (*Id.*, ex. 6 at 1) He has served as an expert witness in civil and criminal courts "with respect to knowledge and experience in the science of engineering as it relates to municipal and traffic engineering and accident reconstruction." (*Id.*) As Defendants note, his resume demonstrates "over 40 years of experience . . . in accident reconstruction." (D.I. 54 at 17 (Defendants noting that Mr. Desch has "skill and knowledge greater than the average layman with regard to engineering, automobile accidents and accident reconstruction")) Mr. Desch is not a biomechanical engineer. (D.I. 48, ex. 4 at 125)

■ In post–*Daubert* opinions, courts have been fairly consistent in discussing, as a general matter, the type of testimony that a biomechanical engineer or an accident reconstructionist is qualified to put forward pursuant to Rule 702. Courts have often examined the propriety of testimony from biomechanical engineers, who normally do not diagnose and treat physical ailments, but whose work entails "apply[ing] the principles in mechanics to the facts of a specific accident . . . and the forces generated in that accident" and explaining "how the body moves in response to those forces [to] determine what types of injuries would result from the forces generated." *Bowers v. Norfolk S. Corp.*

537 F.Supp.2d 1343, 1377 (M.D.Ga.2007) (internal quotation marks and citations omitted). In the context of litigation, biomechanical engineers typically are qualified to "render an opinion as to the forces generated in a particular accident and the general types of injuries those forces may generate." *Id.* (citations omitted); *Burke v. TransAm Trucking, Inc.*, 617 F.Supp.2d 327, 334 (M.D.Pa.2009).

■ In contrast, courts have typically permitted experts in the field of accident reconstruction to offer testimony about facts involved in the "sequence of events immediately preceding an accident," such as those relating to "vehicle mass; direction of skid marks; dimensions of vehicles involved; dents, breaks and paint transfers of vehicles; road surface textures; and physics principles of mechanics such as inertia, velocity, coefficients of friction, and operating characteristics of vehicles." *Tuato v. Brown*, 85 Fed.Appx. 674, 677 n. 3 (10th Cir.2003) (internal quotation marks and citations omitted); *see also Croskey v. Estate of Cheyney*, No. CV 09–44–M–DWM, 2011 WL 3417098, at *2 (D.Mont. Aug. 4, 2011) (permitting testimony from accident reconstruction expert regarding amount of force involved in a collision and how that compares to force associated with other human activities). However, such experts are typically not permitted to offer opinions on the actual cause, existence or extent of a person's injuries. *Snyder v. Harrington*, No. 1:08 CV 1031, 2010 WL 4723483, at *3 (N.D.Ohio Nov. 15, 2010); *cf. Ortiz v. Yale Materials Handling Corp.*, No. CIV 03–3657FLW, 2005 WL 2044923, at *5–6 (D.N.J. Aug. 24, 2005) (finding that mechanical engineer was not qualified to testify about the dynamics of an accident or the forces exerted on the body of the victim in the accident).

For example, in the recent case of *Burgett v. Troy–Bilt LLC,* Civil No. 12–25–ART, 2013 WL 3566355 (E.D.Ky. July 11, 2013), the United States District Court for the Eastern District of Kentucky ruled that, pursuant to Rule 702, an accident reconstruction expert could not offer certain opinions at trial, in a case involving a plaintiff who had been thrown from his lawnmower and had his foot sliced by a mower blade. *Burgett,* 2013 WL 3566355, at *1, *4. The *Burgett* Court held that the expert could not opine on issues including: "(1) whether [plaintiff's] injuries are consistent with his account of the incident, (2) what [plaintiff] would have done as he was ejected from his seat, and (3) whether [plaintiff] could have engaged the cruise control switch while falling off the mower." *Id.* at *4. This was because the expert's resume reflected no training in biomechanical analysis and he had offered nothing beyond "bald assertions" suggesting he could answer basic biomechanical questions. *Id.* at *4–5.

In line with rulings like that in *Burgett,* issues such as where Withrow's hand was located at the time of the accident (and relatedly, where his body was located, as that affects how and where his hand was positioned) and how the injuries to his hand occurred, fall squarely within the realm of the field of biomechanics. Yet Mr. Desch's credentials indicate no real experience in that field.[7] In their briefing, in support of the assertion that Mr. Desch is sufficiently qualified to offer an opinion on these matters, Defendants point only to Mr. Desch's own deposition statement in which he asserted that he is so qualified. (D.I. 54 at 17) But even in that deposition testimony, Mr. Desch underscored the strength of Plaintiff's arguments here. In other portions of the deposition, Mr. Desch repeatedly emphasized that he had no medical training and was not qualified to give an opinion regarding Withrow's "injuries"—noting that such opinions should be "handled by a biomechanical expert." (D.I. 48, ex. 4 at 125–26); *cf. Ortiz,* 2005 WL 2044923, at *6 (finding that plaintiff's expert's admission that a biomechanical engineer was needed to address certain subject matter supported court's decision to exclude expert's testimony regarding, *inter alia,* forces acting on plaintiff during accident).

Despite this admission, portions of Mr. Desch's expert reports *do* relate to testimony about Plaintiff's hand injuries and how Withrow's likely hand and body position caused such injuries to occur. In his deposition, Mr. Desch initially described his proposed testimony as "a matter of connecting the locations of contact of the door and the side of a trailer, and then placing a hand in that position because that's where the injury occurred"—testimony that "doesn't require any type of medical opinions." (D.I. 48, ex. 4 at 124) But he then went on to describe the substance of his opinion in this area (as he does in his reports):

> I think I do discuss how, if [ ] Withrow had his hand on the handle, however, as he indicated he had, not only would you see damage to the inside of his door panel, *but he now would be exposing his little finger and the back of his hand to the contact, and that wasn't the area that was severed. It was the top three fingers. So the orientation of his hand would have been more upright as op-*

---

7. Mr. Desch's lengthy resume contains only one reference to biomechanics: that he attended a training course titled "Injuries, Anatomy, Biomechanics and Federal Regulation" over 20 years ago, in 1992. (D.I. 48, ex. 6 at 4) Defendants do not suggest that this brief training experience has bearing on Mr. Desch's qualifications to testify about the subject matter at issue.

posed to horizontal, and I don't know if that requires any type of expertise either.

(*Id.* at 124–25 (emphasis added)) Any reading of the substance of this portion of Mr. Desch's opinion reveals that it is squarely about what types of bodily injuries "would [or would not] result from [mechanical] forces generated" by Withrow's accident—just the type of biomechanical, injury-related testimony that Mr. Desch has acknowledged he does not have the experience to provide. *Bowers,* 537 F.Supp.2d at 1377.

Perhaps the clearest indication that Mr. Desch is not qualified under the meaning of Rule 702 to provide the testimony at issue has come from the statements of Defendants' counsel. As part of an earlier, related telephonic hearing, the Court asked Defendants' counsel why it was seeking to have Dr. Bove, an biomechanical engineer, provide additional expert testimony by way of the Bove Reply, and why "could not Mr. Desch cover the ground that [Dr. Bove] is going to cover[.]" (D.I. 56, ex. A at 10) Defendants' counsel replied:

Well, Your Honor, I think the overarching issue is that the jury needs enough information to decide this case.... *And, in terms of the issue with regard to these liability experts, I think that there is just the additional physical evidence of the plaintiff's hand placement,*

and that is one thing that our accident reconstructionist cannot speak to. It really requires a biomechanical engineer to discuss the mechanisms of how the accident occurred in terms of plaintiff['s] hand placement.

(*Id.* (emphasis added)) In related briefing in this case, Defendants' counsel has said the same. (D.I. 44 at 10 ("Only Dr. Bove, as a biomechanical engineer, is competent to testify to the biomechanical aspects of how plaintiff's injury occurred.")) And at oral argument, Defendants' counsel appeared to concede the point.[8]

Accordingly, the Court orders that, pursuant to Rule 702, Mr. Desch be precluded from testifying at trial regarding Withrow's hand and body placement, and about the cause of Withrow's hand injuries.

### 2. Mr. Desch's Mock–Up Test and Related Testimony

Plaintiff next challenges Mr. Desch's ability, pursuant to Rule 702, to offer the Mock–Up Test and any opinions based on it at trial, arguing that the test fails to meet *Daubert*'s requirements as to reliability and fit. (D.I. 48 at 11) The Third Circuit has consistently used the following eight factors in determining whether a particular methodology is reliable, while maintaining that the list is not definitive: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review;

**8.** (*See, e.g.,* Tr. at 30–31 ("[A]s far as [ ] Withrow's body mechanics, how he was sitting, how he was positioned, all of that is properly addressed by the biomechanical engineer"); *id.* at 31–32 ("Where the hand is would be Dr. Bove, and what [ ] Withrow's position had to be in order to put the hand there would have to be Dr. Bove."); *id.* at 32 ("I think Mr. Desch, because of his investigation of the equipment, his investigation of the physical aspects and the markings on the equipment, should be able to testify where those two things came together, the door and the trailer.

But Dr. Bove has to testify where the hand was.")) In the parties' briefing, there was a dispute as to whether Mr. Desch, even were he unqualified to opine on these issues on his own, could nevertheless rely on Dr. Bove's opinion as part of his own testimony. (D.I. 54 at 18; D.I. 56 at 4–5) The Court need not address this issue here, in light of its ruling below on the Motion to Strike, as Defendants have made clear that if Dr. Bove is permitted to testify, they would not seek to have Mr. Desch address Dr. Bove's opinions. (Tr. at 31)

(3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." *Meadows,* 306 Fed.Appx. at 788. Plaintiff contends that the Mock–Up Test fails each of these reliability factors—that the Mock–Up Test consists of no testable hypothesis, is not subject to peer review, has no known rate of error and a high potential rate of error due to a lack of controls in place, is not generally accepted, has no relationship to established reliable methods, was not performed by Mr. Desch himself, and has never been put to any non-judicial use. (D.I. 48 at 12) And as to fit, Plaintiff argues that "[b]ecause the Mock–Up Test has drastically different conditions than those present at the accident, it does not meet the 'fit' requirement of Rule 702 and should be excluded." (*Id.* at 14)

For their part, Defendants do not really attempt to argue that the methodology of the Mock–Up Test would pass muster under the *Daubert* requirements of reliability and fit. Rather, at least at times, Defendants assert that the Mock–Up Test is "nothing more than a visual demonstration of a proven scientific theory, the 'bow wave' theory." (D.I. 54 at 11) To the extent that Defendants engage in an analysis of the *Daubert* requirements as to reliability and fit, they do so with respect to the bow wave theory, as opposed to the Mock–Up Test. (*See, e.g., id.* at 11, 13 (arguing that Mock–Up Test is reliable because, *inter alia,* "the basis of the test, the 'bow wave' theory has been subject to peer review and is an accepted scientific theory" and "the 'bow wave' theory has

been employed and discussed in several lawsuits"))

After reviewing the parties' arguments, and viewing the videotape evidence of the Mock–Up Test, the Court cannot agree with Defendants' characterization of the test's purpose and impact. The Mock–Up Test is clearly not meant simply to depict what the bow-wave theory is in the abstract—in a sterile environment divorced from the context of this case. A closer read of Defendants' briefing actually makes this clear, as it notes that the " 'bow wave' theory is not disputed by Plaintiff" but instead, "[w]hat is disputed is the application of the theory to the case facts." (D.I. 54 at 10) Indeed, as Defendants note, the "test was not performed to prove the theory[.]" (*Id.*) Instead, Defendants acknowledge that the test was created to "assist the trier of fact to understand *how the 'bow wave' theory could affect Withrow's vehicle at the time of the accident.*" (*Id.* at 15 (emphasis added); *see also id.* (noting that the test was conducted to show "how the 'bow wave' theory could affect the facts of the case")) Thus, it becomes clear that it is not the bow wave theory in the abstract that is the proper subject of Plaintiff's *Daubert* Motion; instead, it is the particular methodology (the Mock–Up Test) that Mr. Desch uses to show how that theory "could affect Withrow's vehicle at the time of the accident." *See, e.g., Meadows,* 306 Fed.Appx. at 789–90 (analyzing an expert's proffered experimental evidence, and noting that the district court had rejected that evidence under Rule 702, as "it was not the 'general physics principles' [related to the experiments] with which the District Court took issue, but rather the method by which [plaintiff's expert] applied the principles to the facts of [the] accident").

Although the Court does not doubt that the Mock–Up Test would not also pass

muster under *Daubert*'s "reliability" prong, its failure to "fit" the facts of this case is the clearest reason why Mr. Desch's testimony regarding the test should be prohibited. The conditions associated with the Mock–Up Test bear little resemblance to the conditions of the actual accident here. The mock-up or surrogate "door" used in the test consisted of foam board like those purchased at an art supply store, which was taped to a pillar with a fence hinge. (D.I. 48 at 7 & ex. 4 at 157–163) Mr. Desch acknowledged that this mock-up door was "certainly not as heavy as a [car] door." (*Id.,* ex. 4 at 160) Mr. Desch took no measurements as part of the testing, which occurred on a different road in a different state than did the accident, and involved Mr. Desch's associate holding the mock-up door and observing the effect on it generated by randomly passing tractor-trailers. (*Id.* at 159–169) Mr. Desch thus made no attempt to correlate: (1) the measurements, contents or weight of the mock-up door to Withrow's door; (2) the wind conditions at the testing site to those at the time of the accident; (3) the size of the tractor-trailers that passed by the mock-up door to that of Spears' truck; or (4) the speed of the tractor-trailers as compared to that of Spears' truck on the day of the accident. (*Id.*) Mr. Desch also explained how his testing was "limited" by the fact that the mock-up door was not able to be positioned as close to the highway as was Withrow's actual car door. (D.I. 42, ex. C at 3) And there was no attempt made to replicate the effect of a tractor-trailer impacting the mock-up door.

Ultimately, it is difficult to ascertain any similarities between the circumstances of the Mock–Up Test and that of the accident, and thus, how the test could at all further help the jury understand "how the 'bow wave' theory … affect[ed] Withrow's vehicle at the time of the accident." [9] In such cases, courts in this Circuit have regularly excluded an expert's testimony regarding certain testing, on the grounds that there was insufficient "fit" between the testing methodology at issue and facts of the case. *See, e.g., Meadows,* 306 Fed.Appx. at 790–91 (concluding that there was no fit between expert's testing and facts of case where testing did not replicate accident conditions, and noting that " '[g]iven the lack of resemblance [the expert's] tests have to the events [of the accident,] it is difficult to say how, if at all, these tests could assist the jury in determining what caused the accident' "); *Ortiz,* 2005 WL 2044923, at *10 (finding that expert's testing did not fit with the facts of the case where expert did not perform "any lateral tip-over testing with forklifts, which is the kind of accident that caused Plaintiff's injuries"); *In re TMI Litig. Cases Consol. II,* 911 F.Supp. 775, 798 (M.D.Pa.1996) (excluding demonstrative evidence due to absence of "fit" where the movie and model used by an expert "bore [no] meaningful relationship" to the plume dispersion at issue in the relevant accident). That is the case here, and for that reason alone, Mr. Desch's testimony regarding the Mock–Up Test should be precluded. [10]

**9.** Indeed, at oral argument, when asked by the Court what value such a test had, Defendants' counsel did not offer a substantive response. (Tr. at 34–35)

**10.** In a related line of case law, Courts in this Circuit reviewing experimental or demonstrative evidence (sometimes under Rule 702, and sometimes under Rule 403), have explained that the admissibility of such evidence depends upon whether it purports to replicate the actual events of an accident, or instead whether it merely illustrates general scientific principles. *See, e.g., Altman v. Bobcat Co.,* 349 Fed.Appx. 758, 763 (3d Cir.2009); *Elick v. Ford Motor Co.,* Civil Action No. 08–1700,

### 3. Mr. Desch's Testimony on Witness Credibility

██ Plaintiff next identifies certain portions of Mr. Desch's proposed expert testimony that assertedly involve Mr. Desch "comment[ing] on the credibility of [ ] witnesses"; he argues that such testimony should be excluded pursuant to Rule 702. (D.I. 48 at 18) The specific examples identified by Plaintiff are as follows:

(1) In response to a hypothetical question at his deposition asked by Plaintiff's counsel, regarding how Mr. Desch's opinion as to the cause of the accident would change if Spears testified at trial that he crossed the white fog line onto the shoulder of the road, Mr. Desch—while referring back to other portions of Spears' prior testimony and evidence relating to the crash—said: "If he testified that he was on the white line, I would only suggest to you that I don't know if his memory could be that exact or specific."

(2) In response to that same line of questioning, Mr. Desch said of Spears, after referring back to facts regarding the accident and portions of Spears' testimony, that "I don't think that [Spears' hypothetical future] testimony would be necessarily credible if he says, oh, I went across the white line. I don't think he would know that."

(3) In his deposition, in response to a question relating to whether Withrow had his hand on the handle of the driver's front door of his car at the time of the accident, Mr. Desch said: "I don't think [ ] Withrow remembers much about that, nor could he."

(4) In his deposition, in asserting that Withrow did not have his hand on the inside handle of this door at the time of collision, Mr. Desch said: "But I know [ ] Withrow's testimony is definitely not correct."

(5) In the Desch Report, regarding the position of Withrow's hand at the time of impact, Mr. Desch wrote: "He also stated that he put his seatbelt on prior to closing the door of his vehicle. This testimony is suspect[,] since if seated and belted, his left hand would not have been placed along the edge of the door which is where it was at impact."

(D.I. 48 at 18 n.85; *id.*, ex. 4 at 39–40, 75, 98; *id.*, ex. 1 at 16; D.I. 56 at 7 n.25)

██ Courts have noted that, pursuant to Rule 702, it is generally inappropriate for an expert witness to offer an opinion on the credibility of fact witnesses. *See, e.g., Suter v. Gen. Accident Ins. Co. of Am.*, 424 F.Supp.2d 781, 793 (D.N.J.2006); *Hill v. NSB Niederelbe Schiffahrtsges.mbH & Co.*, No. Civ.A. 02–2713, 2004 WL 569908, at *1 (E.D.Pa. Mar. 5, 2004);

---

2010 WL 2465172, at *1–2 (W.D.Pa. June 17, 2010); *Montgomery v. Mitsubishi Motors Corp.*, Civil Action No. 04–3234, 2006 WL 1892719, at *5 (E.D.Pa. July 10, 2006). If a party seeks to introduce visual demonstrations that purport to replicate the events of an accident, such evidence is admissible if the tests at issue were conducted under conditions substantially similar to the actual conditions. *See, e.g., Altman,* 349 Fed.Appx. at 763; *Montgomery,* 2006 WL 1892719, at *5. But when demonstrative evidence is offered only to illustrate general scientific principles, rather than as a reenactment of events, it need not pass the substantial similarity test.

*Altman,* 349 Fed.Appx. at 763; *Montgomery,* 2006 WL 1892719, at *5. Here, as noted above, the Court has found that the Mock–Up Test is meant to and does more than simply illustrate the application of a general scientific principle. Instead, it involves the use of a mock-up or "surrogate" door, positioned near a highway and passing tractor-trailers, in order to demonstrate to a jury how the bow wave theory relates to the specifics of Withrow's accident. Yet, for the reasons set out above, the Mock–Up Test cannot be said to have been conducted under "substantially similar" conditions to the actual conditions of the accident.

*Griggs v. BIC Corp.*, 844 F.Supp. 190, 201 (M.D.Pa.1994), *aff'd* 37 F.3d 1486 (3d Cir. 1994). As a guidepost regarding how to police the line between inappropriate commentary on a fact witness's credibility on the one hand, and permissible expert testimony on the other, both parties cite to the decision in *Watts v. Hollock*, No. 3:10cv92, 2011 WL 6026998 (M.D.Pa. Dec. 5, 2011). (D.I. 54 at 18–19; D.I. 56 at 6) There, the United States District Court for the Middle District of Pennsylvania held that portions of an accident reconstruction expert's testimony did not improperly transgress this line, where his "opinions [were] not mere comments on the credibility of eyewitness testimony, but the result of accident reconstruction analysis" in that his analysis "produced results contrary to [certain] eyewitness accounts" and were meant to "highlight the contradictions" between the expert's analysis and the eyewitness testimony. *Watts*, 2011 WL 6026998, at *6.

With regard to the third, fourth and fifth portions of testimony listed above, Plaintiff's objection is mooted by the Court's decision that Mr. Desch may not put forward testimony regarding Withrow's hand and body position at the time of the collision, or as to the cause of Withrow's hand injuries. As to the first and second portions of testimony listed above, it is less than clear that Mr. Desch means to offer these particular responses as part of his trial testimony, as the answers came in response to hypothetical questions asked by Plaintiff's counsel at deposition. Even were they meant to be so offered, the Court finds that in general, the substance of the testimony is permissible under Rule 702. In both cases, prior to and after the responses at issue, Mr. Desch cited to evidence relating to the crash and to portions of his accident reconstruction analysis; when he referenced certain (hypothetical) statements of Spears in re-sponse to Plaintiff's counsel's questions, it was to explain why such statements would conflict with Mr. Desch's assessment of how the accident occurred. Mr. Desch's references to what Spears' "memory" would be, or to whether certain testimony of his would be "credible[,]" comes closest to the line of inadmissibility. However, this problem can easily be remedied by having Mr. Desch frame his trial testimony in terms of whether certain witness statements would be "consistent" with his accident reconstruction analysis and his view of the physical evidence. *See Watts*, 2011 WL 6026998, at *5–6 & n. 4 (finding expert's conclusion that "Mr. Watt's ... testimony that the tractor wheels were spinning and throwing mud is not consistent with the photographs taken at the scene" to be permissible under Rule 702).

Thus, to the extent that Plaintiff's objections on this ground are not rendered moot, they are denied in line with the analysis set out above.

### 4. Mr. Desch's Testimony on Violations of Delaware Law

■■■ Plaintiff similarly argues that certain proposed testimony in the Desch Report, concluding that Withrow violated a particular Delaware motor vehicle law, should be excluded pursuant to Rule 702. (D.I. 48 at 19; *id.,* ex. 1 at 16) It is well-established that experts may not testify as to what the law requires or testify as to the governing law. *Holman Enters. v. Fid. & Guar. Ins. Co.*, 563 F.Supp.2d 467, 472 (D.N.J.2008) (citing *United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir.1991)); *see also Casper v. SMG*, 389 F.Supp.2d 618, 621 (D.N.J.2005) ("In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law."). Defendants did not respond to this argument in their answer-

ing brief, and at oral argument, Defendants' counsel conceded that Mr. Desch is not permitted to testify as to conclusions of law. (Tr. at 25–26 ("I don't think Mr. Desch can opine on the law. He is not a lawyer.")) Therefore, the Court grants Plaintiff's motion in this regard, and Mr. Desch will be precluded from testifying as to his conclusion that Withrow violated particular Delaware motor vehicle laws.

## III. MOTION TO STRIKE

### A. Standard of Review

The Federal Rules of Civil Procedure require a testifying expert to prepare and sign a written report containing, *inter alia,* "a complete statement of all opinions the witness will express and the basis and reasons for them ... at the times and in the sequence that the court orders." Fed. R.Civ.P. 26(a)(2)(B)(i) & (a)(2)(D). Rule 26 notes that after an initial expert report is filed, additional expert reports "intended solely to contradict or rebut evidence on the same subject matter" may be filed thereafter. Fed. R. Civ P. 26(a)(2)(D)(ii). "If a party fails to provide information or identify a witness [in the manner required by the Court under Rule 26], the party is not allowed to use that information or witness ... at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). If an expert report is stricken, that action effectively precludes the expert from testifying as to the subject matter and opinions contained in the report. *See, e.g., Kenexa Brassring, Inc. v. Taleo Corp.,* 751 F.Supp.2d 735, 759 (D.Del.2010); *Inline Connection Corp. v. AOL Time Warner Inc.,* 472 F.Supp.2d 604, 615 (D.Del.2007).

Although the Federal Rules clearly contemplate the exclusion of untimely or improper expert disclosures (and the concomitant exclusion of expert testimony), the Third Circuit has cautioned that be-

cause "[t]he exclusion of critical evidence is an extreme sanction," it should not be imposed where an untimely or improper expert disclosure amounts to only a "slight deviation from pre-trial notice requirements" or occasions only "slight prejudice" to the movant. *Paoli,* 35 F.3d at 791–92 (internal quotation marks and citations omitted). Instead, the remedy of exclusion should be reserved for circumstances amounting to "willful deception or flagrant disregard of a court order by the proponent of the evidence." *Id.* at 792 (internal quotation marks and citations omitted); *see also Bridgestone Sports Co., Ltd. v. Acushnet Co.,* No. CIVA 05–132 JJF, 2007 WL 521894, at *4 (D.Del. Feb. 15, 2007) (noting that while the decision to exclude expert testimony is context-specific, "evidence should be excluded sparingly and only in circumstances involving litigation conduct that is clearly unprofessional or inappropriate, and in circumstances creating prejudice to the party against whom the evidence is offered").

Therefore, in considering whether to exclude an untimely or otherwise improper expert disclosure, the Third Circuit has directed district courts to weigh certain factors: (1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply with the court's order; (5) the explanation for the failure to disclose; and (6) the importance of the testimony sought to be excluded. *See Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904–05 (3d Cir.1977), *overruled on other grounds, Goodman v. Lukens Steel Co.,* 777 F.2d 113 (3d Cir.1985); *see also Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 719

(3d Cir.1997).[11] Although district courts tend to err on the side of admitting expert testimony in such cases, this Court has noted that such testimony may be excluded in order to protect against the "flouting of discovery deadlines," so as to maintain "fidelity to the constraints of Scheduling Orders and deadlines[, which] is critical to the Court's case management responsibilities." *Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457, 463 (D.Del.2005) (internal quotation marks and citation omitted), *rev'd on other grounds*, 543 F.3d 1306 (Fed.Cir. 2008).

## B. Legal Discussion

### 1. Timeliness of the Bove Reply

■ Plaintiff argues that the Bove Reply was untimely and that its late submission violated the terms of the Court's Scheduling Order. That order, as set out above, established a system whereby: (1) the party with the initial burden of proof on an issue was to file an opening expert report; (2) the opposing party was to file a rebuttal report "to contradict or rebut evidence on the same matter"; and (3) "[r]eply expert reports from the party with the initial burden of proof" were to be submitted after the rebuttal report. (D.I. 29, ex. B at ¶ 3(f)(i)); *see also Oracle Am. Inc. v. Google Inc.*, No. C 10–03561 WHA, 2011 WL 5572835, at *3 (N.D.Cal. Nov. 15, 2011) (noting that such orders contemplate a "narrowing of issues" through the service of the respective reports). Defendants submitted the Bove Reply (along with the Desch Reply), after the only rebuttal report (the Govatos Rebuttal) had been filed by Plaintiff. Plaintiff submits

that the Bove Reply was untimely in that it is not a proper reply report, as it is not responsive to the content of the Govatos Rebuttal, and thus should have been served during the opening round of expert reports. (D.I. 42 at 10)

Defendants, for their part, acknowledge that the Govatos Rebuttal is primarily focused on a discussion of the "bow wave" theory and how, in Dr. Govatos' view, application of that theory would have worked to push a car door inward as a tractor-trailer passed by. (D.I. 44 at 4–5) However, Defendants argue that the "only relevance of the bow wave theory is to explain how the accident occurred and how Plaintiff sustained his injury" and that "how the accident occurred and how Plaintiff sustained his injury ... is the same subject matter addressed by [Dr. Bove, as he provides] an analysis of how Plaintiff sustained his injury with regard to door positioning and interaction with Defendant's vehicle." (*Id.*)

■ A rebuttal or reply expert report is proper if the intent of the report is " 'solely to contradict or rebut evidence on the same subject matter identified' by the opposing party's expert report." *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co.*, 290 F.R.D. 11, 16 (D.Mass.2013) (quoting Fed.R.Civ.P. 26(a)(2)(D)(ii)); *see also Hans v. Tharaldson*, Civil No. 3:05–cv–115, 2011 WL 6937598, at *10 (D.N.D. Dec. 23, 2011) (noting that "[t]he function of rebuttal evidence is to explain, repel, counteract or disprove evidence of the adverse party"); *Oracle Am. Inc.*, 2011 WL 5572835, at *3

11. Although these factors are sometimes articulated in slightly different ways, they are generally referred to as "the *Pennypack* factors." *See, e.g., Paoli*, 35 F.3d at 792. While certain articulations omit the "explanation" factor, in such cases, the non-movant's explanation for its actions is still taken into account in relation to the "bad faith or willfulness" factor. *See Lambda Optical Solutions, LLC v. Alcatel–Lucent USA Inc.*, Civ. Action No. 10–487–RGA–CJB, 2013 WL 1776104, at *2 n. 2 (D.Del. Apr. 17, 2013) (citing cases). The Court will consider these latter two factors together below, as here they are related.

("Reply [expert] reports must be limited to true rebuttal....."). Such rebuttal and reply reports "may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert." *Glass Dimensions*, 290 F.R.D. at 16; *see also Hans*, 2011 WL 6937598, at *10. On the other hand, expert reports that simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal or reply reports. *Glass Dimensions*, 290 F.R.D. at 16 (finding expert report that was presented as a rebuttal was in fact an untimely affirmative report, where the report discussed the "same general subject matter" as the report it was supposed to rebut but did not mention, contradict, or purport to respond to that report).

For a number of reasons, the Court concludes that the Bove Reply does not attempt to contradict or rebut the contents of the Govatos Rebuttal, and thus exceeds the scope of a proper reply report.

As an initial matter, a review of the two reports makes clear that their contents are quite distinct. The Govatos Rebuttal clearly states that it is intended to respond only to a "portion of [the Desch Report] report [that] discusses airflow around the Spears tractor-trailer, and how that airflow affected this collision." (D.I. 42, ex. B. at 2) After brief reference to certain basic facts regarding the accident, the entire "Analysis and Discussion" Section (amounting to five of the report's eight pages) focuses exclusively on the "bow wave" theory, and the basis for Dr. Govatos' rebuttal of Mr. Desch's conclusion that a "bow wave" would have created flow fields that would push a car door like Withrow's further open as a tractor-trailer passed by. (*Id.* at 3–8) In doing so, Dr.

Govatos makes almost no reference to the accident scene in this case or to Withrow's body position or hand injuries. In contrast, the main portion of the Bove Reply is titled "Biomechanical Analysis"; it evaluates the accident from "a biomechanical perspective" to assess Withrow's "positioning and kinematics" and the "mechanisms associated with his injuries." (*Id.*, ex. D at 4–8) The Bove Reply goes on to evaluate the type of evidence that the body of Dr. Govatos' report does not take up directly: evidence regarding the accident scene, of Withrow's hand and body position and of likely causes of Withrow's hand injuries. Dr. Bove explains how this evidence led him to draw conclusions as to where Withrow's hand and body were positioned at the time of the collision. (*Id.*)

The Court's conclusion is further confirmed by the Bove Report's scant mention of the Govatos Rebuttal. Although on its first page, the Bove Reply states that it was "prepared ... in response [ ] to" the Govatos Rebuttal, the Govatos Rebuttal is not mentioned again until the last page of the document. (D.I. 42, ex. D at 1–8) There, after Dr. Bove notes that Dr. Govatos discussed the "bow wave" theory, he states that Dr. Govatos did "not offer any alternative explanation for the finding that contact between the door and the tractor-trailer was initiated at the rear portion of the trailer nor does he offer any mechanism to explain the injuries sustained by [ ] Withrow." (*Id.* at 8) These references, in the context of the instant motion, read almost like an admission: that the Bove Reply's intent, in relation to the content of the Govatos Rebuttal, is to discuss certain subject matter that Dr. Govatos *did not discuss*.[12] More broadly, the Bove Reply does not reference or critique the content of *what was discussed* in the Govatos Rebuttal, nor does it mention Dr. Govatos' opinions regarding the "bow wave" theory

---

12. Similarly, the Desch Reply notes that "the Govatos report [manifests] *the lack of explana-*

and its application. In short, the Bove Reply does not do what a reply brief normally would do.

Of course, at the highest level of abstraction, it can be said that both the Govatos Rebuttal and the Bove Reply are, as Defendants suggest, about the same *general* subject matter: "how the accident occurred" and "and how Plaintiff sustained his injury." But in light of the fact that they discuss different and largely distinct topics relating to that general subject matter, the Bove Reply cannot be deemed a proper reply report. Despite the representations made to the Court by counsel for Defendants in its briefing that the Govatos Rebuttal "significantly discusses Plaintiff's hand positioning at the time of the accident[,]" any fair reading of Dr. Govatos' report would lead to the conclusion that this is not so. (D.I. 35 at 2; D.I. 42, ex. D) [13]

Thus, the Bove Reply was not a proper reply expert report. If Defendants had wished to affirmatively submit Dr. Bove's report in a timely fashion pursuant to the Scheduling Order, they should have done so by the deadline for filing initial expert reports (as they did with the Desch Report). Otherwise, reply expert reports were limited to those that truly address the scope of rebuttal reports, a test that the Bove Reply does not meet. Because the Court thus finds that the Bove Reply was untimely filed, it must determine whether the report should be stricken by applying the *Pennypack* factors.[14]

## 2. Applying the *Pennypack* Factors

### a. Surprise or prejudice to the moving party

■ In determining whether the untimely introduction of Dr. Bove as an ex-

---

tion by Mr. Govatos as to how he believes [ ] Withrow was injured, where [ ] Withrow was positioned relative to his vehicle and where [ ] Withrow's hand was when his fingers were severed." (D.I. 42, ex. C at 1 (emphasis added))

13. Both parties cite for support to the Court's decision in *Wyeth Holdings Corp. v. Sandoz, Inc.*, Civil Action No. 09–955–RGA–CJB (D.I. 115) (D.Del. Mar. 14, 2012). (D.I. 42 at 10–15; D.I. 44 at 11–12) In *Wyeth*, the Court ruled that the content of a microbiologists' reply expert report was not untimely, and was a proper reply report, where the content of the reply report repeatedly cited to the rebuttal report to which it responded, and offered direct, focused critiques of that rebuttal report. *Id.* at *10–11. Thus, in *Wyeth*, it could easily be said that the need for the reply report "arose in response to the particular way that data was analyzed in the [rebuttal report]." *Id.* at *11. As noted above, the Bove Reply is thus dissimilar in many respects from the reply report at issue in *Wyeth*.

14. In their briefing, and again at oral argument, Defendants suggested another reason why the submission of the Bove Reply was not untimely or improper: that there was confusion regarding the proper order of sub-

mission of expert reports in the case. (D.I. 44 at 3, 7–8; Tr. at 56) Defendants suggest that because they viewed Plaintiff as having the burden of proof on liability-related issues, they did not feel as if they were required to file Dr. Bove's report by the deadline for initial expert reports. (Tr. at 56) Plaintiff responds that he has always made clear that he did not wish to file an affirmative expert report on liability. (D.I. 49 at 8–9) Plaintiff argues that because Defendants have the burden of proof as to their affirmative defenses, and because they filed the Desch Report at the deadline for initial expert reports, it was clear that if Defendants wished to file an affirmative report from Dr. Bove, they should also have done so by that deadline. (*Id.*) Whatever merit Defendants' argument might have had, the Court discounts it here, in light of Defendants' prior submissions in the case. As referenced above, *see supra* note 3, when Plaintiff originally challenged Defendants' ability to file the Bove Reply, Defendants argued that the reply was permissible because it was a proper reply to the scope of the Govatos Rebuttal and had been prompted by the filing of the Govatos Rebuttal, and not for any other reason. (D.I. 35)

pert was harmless or substantially justified, the Court first considers the extent to which the Bove Reply came as a surprise to Plaintiff or would otherwise prejudice Plaintiff.

The Court agrees with Plaintiff that the contents of the Bove Reply would have caused him some amount of surprise—at least in light of how Defendants described what the Bove Reply would speak to. At an earlier stage of this case, when the parties had an initial dispute about the filing of the Bove Reply, *see supra* note 3, Defendants explained their rationale for wishing to file the Bove Reply and what its contents would be:

> Upon receipt and review of [the Govatos Rebuttal], *which significantly discusses Plaintiff's hand positioning at the time of the accident,* Defendants realized the need for a biomechanical engineer to address the issue raised by [Dr. Govatos]. . . . Additionally, there is a lack of prejudice to Plaintiff *given the scope of the report, an area which was addressed by* [the Govatos Rebuttal]. . . .

(D.I. 35 at 2 (emphasis added)) However, as noted above, while the Govatos Rebuttal briefly mentions the position of Plaintiff's hand in its introductory paragraphs, the substance of that report is otherwise not at all about "Plaintiff's hand positioning at the time of the accident"—it is about Dr. Govatos' discussion of principles relating to the "bow wave" theory.[15] Nor did the actual contents of the Bove Reply (again, other than in only the most broad, generic sense) discuss "an area which was addressed" by the Govatos Rebuttal. Because Defendants described the Bove Reply to Plaintiff prior to its submission in a way that gives the wrong impression about what its contents would include, Plaintiff

might well have been surprised to read the actual contents of the Bove Reply when he finally received it earlier this year.

On the other hand, the thrust of Defendants' theories regarding Withrow's hand and body position and injuries, as set out in the Bove Reply, would not have been surprising to Plaintiff. Even Plaintiff acknowledges that "the subject matter of Dr. Bove's opinion is already covered by Mr. Desch [in the Desch Report]." (D.I. 42 at 12) In this way, even months prior to the submission of the Bove Reply, Plaintiff had a good understanding as to what Defendants' position was on these topics. The Bove Reply simply further flushed out those views.

As to prejudice, Plaintiff argues that allowing Dr. Bove to testify would afford Defendants the "unfair advantage" of having two experts (Mr. Desch and Dr. Bove) covering the same subject matter at trial and bolstering one another's opinions in the eyes of the jury. (*Id.* at 13) However, because the Court has determined that Mr. Desch should not be permitted to testify about Withrow's hand or body position, or about the causation of Withrow's hand injury, this will no longer be a concern. Plaintiff also contends that he will be prejudiced were the Court to allow "new and extensive opinions at the reply stage that should have been disclosed months ago at the opening report stage." (*Id.*) However, Plaintiff's claims of prejudice are particularly general. Plaintiff does not point to aspects of the Bove Reply that have or will necessitate significant expenditure of additional time and resources. The need for Plaintiff to be specific is even more acute here, in a case where Plaintiff himself has noted that he received a preview of the content of the

---

**15.** When the Court asked Defendants' counsel at oral argument if "Dr. Govatos ever talk[s] about hand placement?" Defendants' counsel replied "Exactly hand placement? No, sir. I can't be disingenuous and tell you otherwise." (Tr. at 54–55)

Bove Reply in portions of Mr. Desch's initial report.

Therefore, although Dr. Bove's report could have surprised Plaintiff in a sense, that was not the type of surprise that was likely to be particularly damaging under the circumstances of this case. And Plaintiff's arguments as to prejudice are not strong or well-developed. Therefore, this factor mitigates against striking the Bove Reply.

### b. Ability of the moving party to cure any such prejudice

 Even assuming there is some prejudice to Plaintiff occasioned by its untimely receipt of the Bove Reply, Plaintiff has and can mitigate that prejudice. Plaintiff has already taken the opportunity to depose Dr. Bove once during the pendency of this case. (D.I. 44 at 9) Defendants have also indicated that they would not oppose Plaintiff's request to re-depose Dr. Bove prior to trial, if Plaintiff felt it necessary. (Tr. at 60) There is sufficient time prior to trial for this to occur if needed.[16] Thus, this factor mitigates against granting the Motion to Strike.[17]

### c. Potential disruption to trial

 With respect to whether allowing testimony based upon the Bove Reply would potentially disrupt the trial proceedings, Plaintiff argues that "[a]llowing two experts by the same party offering expert opinions on the same subject matter" will affect trial, in that, *inter alia*, it would be unduly cumulative, would "lengthen the trial" and because Dr. Bove's testimony will "unfairly add credence to Mr. Desch's opinions." (D.I. 42 at 14) As set out above, the Court's ruling as to Mr. Desch's inability to testify on the subject matter covered by Dr. Bove renders these concerns moot.

Trial is scheduled to begin on November 4, 2013. As that date is still months away, to the extent Plaintiff would face any (as yet unspecified) remedial prejudice were the Bove Reply permitted, there is sufficient time for such prejudice to be mitigated without disrupting trial. *Cf. Praxair*, 231 F.R.D. at 463 (excluding supplemental expert report in circumstance where allowing additional discovery would "undoubtedly disrupt the trial process, [which was] set to begin in less than a month"). This

---

**16.** Courts have regularly found that when there is sufficient time for the opposing party to depose an expert who serves an untimely report, this militates in favor of allowing the expert's testimony. *Compare Paoli*, 35 F.3d at 792 (finding district court erred in excluding untimely expert submission where the specifics of expert's testimony was provided to defendants four months before trial and 60 days before end of expert discovery, giving defendants "abundant time to depose" the expert before the discovery deadline) *and Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. C.A. 04–1371–JJF, 2006 WL 2435083, at *1 (D.Del. Aug. 22, 2006) (rejecting a party's claim that it would be prejudiced by a supplemental expert report where the party had almost three weeks to review the report before having the opportunity to depose the expert), *with Praxair*, 231 F.R.D. at

463 (excluding supplemental expert report regarding summary judgement motions, but only where the "report was filed ten days before the summary judgment motions were due, so plaintiffs had no opportunity to conduct rebuttal discovery" for the motions).

**17.** Defendants have also indicated that they would not object to Plaintiff's submission of a sur-reply report in response to Dr. Bove's opinions, (D.I. 44 at 9), but Plaintiff has repeatedly stated that he does not need to have an expert opine on those issues and does not wish to utilize an expert to do so, (Tr. at 61). Even to the extent that Plaintiff did later seek to do so, Plaintiff's counsel acknowledged at oral argument that it would be possible to do this in the months preceding trial. (*Id.* at 42–43)

factor also weighs against granting the Motion to Strike.

### d. Alleged bad faith or willfulness and explanation for failure to earlier disclose

■ The Court next will assess whether Defendants acted willfully or in bad faith by serving the Bove Reply in contravention of the Court's Scheduling Order, and, relatedly, Defendants' explanation for its failure to earlier disclose the report. Plaintiff contends that the bad faith of Defendants is manifested in two ways— both relate to the reasons Defendants originally put forward to Plaintiff and to the Court as to why the filing of the Bove Reply was necessary. *See supra* note 3. Specifically, Plaintiff points to: (1) Defendants' prior representation that the Govatos Rebuttal significantly discussed Withrow's hand position at the time of the accident, and that this prompted their desire to file the Bove Reply (when, in fact, the Govatos Rebuttal does not discuss Plaintiff's hand position); and (2) Defendants' prior representation that they first realized the need for a biomechanical expert after being served the Govatos Rebuttal (when, in fact, Dr. Bove was retained months earlier, in November 2012). (D.I. 42 at 14)

The Third Circuit has found a party to have violated a scheduling order willfully or in bad faith where the violation at issue was one in a line of violations by the non-moving party. *See In re TMI Litig.*, 193 F.3d 613, 722 (3d Cir.1999) (finding bad faith where defendants engaged in a "pattern of filings that constituted a flagrant violation" of court's orders and did not seek leave of court before filing untimely expert reports); *see also Gautier–James v. Hovensa, L.L.C.*, Civ. No. 1:06–cv–00106, 2011 WL 4500153, at *8 (D.V.I. Sept. 27, 2011) (finding this factor satisfied where, *inter alia*, a party's repeated untimely disclosures "cement[ed]" a finding of bad faith). Willfulness or bad faith has not been found, however, where a party's actions have amounted to a mere " '[l]ack of diligence.' " *Paoli*, 35 F.3d at 793 (internal citation omitted). The Third Circuit has not often addressed the middle ground between these two extremes. District courts in the Circuit, however, have tended to reserve such a finding for only extreme circumstances. For example, in *Holbrook v. Woodham*, Civil Action No. 3:05–304, 2008 WL 544719 (W.D.Pa. Feb. 28, 2008), the United States District Court for the Western District of Pennsylvania noted that a finding of willfulness should be reserved for repeated disregard for court orders or otherwise "flagrant" disregard of those orders, and that an "egregious" showing of bad faith was necessary. *Holbrook*, 2008 WL 544719, at *3 (citing *Konstantopoulos*, 112 F.3d at 719–21 & n. 10); *see also Klatch–Maynard v. Sugarloaf Twp.*, Civil Action No. 3:06–cv–0845, 2011 WL 2006424, at *5 (M.D.Pa. May 23, 2011) (finding that plaintiffs' actions constituted a flagrant disregard of the court's discovery order and bordered on wilful deception where plaintiffs submitted report three and a half years after deadline with no substantial justification, and had been on notice of their failure to file expert reports for well over two years).

In this case, Defendants do not have a lengthy history of repeatedly violating the Scheduling Order. Nor does the Court view the timing of Dr. Bove's retention in November 2012, without more, as particularly illuminating.

However, the other issue raised by Plaintiff is more difficult to overlook. As noted above, after Plaintiff challenged Defendants' ability to file the Bove Reply earlier this year, Defendants argued that the submission of the report by the deadline for reply reports would be justified

because the report was prompted by, and would be responsive to, the Govatos Rebuttal. But as the Court has set out above, only the most strained (and ultimately, unpersuasive) reading of the Govatos Rebuttal and the Bove Reply could warrant such a position. (D.I. 49, ex. A at 13) In light of this, it is understandable why Plaintiff would assert that this factor could redound in its favor.

Nevertheless, the Court is not comfortable that this record would support the type of heightened or "egregious" showing required by the Circuit's case law. *See, e.g., Holbrook*, 2008 WL 544719, at *3; *cf. Cmty. Ass'n Underwriters of Am., Inc. v. Rhodes Dev. Grp., Inc.*, Civil No. 1:09–CV–0257, 2013 WL 3510714, at *3–4 (M.D.Pa. July 11, 2013) (stating that court was "not fully satisfied" with plaintiff's counsel's explanation for untimely submission of expert report, but nonetheless denying motion to strike, where court did not detect bad faith on plaintiff's part and other factors militated against exclusion). Perhaps more significantly, even if this factor could redound to Plaintiff's benefit, the Court is not persuaded that its force is strong enough, after analyzing the totality of the *Pennypack* factors (including the lack of a strong showing of prejudice to Plaintiff and the significance of the testimony at issue to Defendants) to warrant striking Dr. Bove's testimony.

### e. Importance of testimony from Dr. Bove

■ The final *Pennypack* factor directs the Court to analyze the importance of Dr. Bove's testimony to Defendants. Here too, Plaintiff's lone argument as to why Dr. Bove's testimony is unimportant—that the Desch Report and the Bove Reply both cover certain of the same topics—has been obviated by the Court's grant of Plaintiff's motion to exclude that portion of Mr. Desch's testimony under Rule 702. (D.I. 42 at 15)

■ In weighing this factor, this Court has previously explained that: "[c]ourts favor the resolution of disputes on their merits." *Abbott Labs. v. Lupin Ltd.*, Civil Action No. 09–152–LPS, 2011 WL 1897322, at *5 (D.Del. May 19, 2011). And here, the merits of a key issue in the case—whether the collision was caused by Spears' negligence—will revolve in significant part around where Spears' truck, Withrow's car door, and Withrow's hand and body all were located at the time of collision. Defendants have sought to have an expert opine on biomechanical subject matter relating to certain of those issues, and granting the Motion to Strike (in conjunction with the Court's resolution of Plaintiff's *Daubert* Motion) would eliminate Defendants' ability to produce that type of testimony at trial.

The Court finds that this factor weighs against a grant of the Motion to Strike.

### f. Conclusion

In accordance with the analysis above, the Court finds that all or nearly all of the *Pennypack* factors, militate against granting the "extreme sanction" called for by the Motion to Strike.[18] This analysis

---

18. The Court's holding in the *Wyeth* case is not to the contrary. In *Wyeth*, the plaintiffs' "sur-rebuttal" microbiologist's expert report was also at issue; the Court ordered that portions of that report should be stricken and that plaintiffs' expert not be permitted to testify regarding those opinions. *Wyeth Holdings Corp.*, Civil Action No. 09–955–RGA–CJB at *23. In *Wyeth*, the stricken portions of the sur-rebuttal report not only failed to respond directly to the defendant's reply report, but also: (1) would have prejudiced the defendant, because they were cumulative to the testimony of another expert plaintiffs were to put forward at trial; and (2) would not have been particularly important to the plaintiffs at trial, in that its contents were cumulative of the testimony of plaintiffs' other expert. *Id.*

drives the conclusion that the submission of the Bove Reply, while an untimely affirmative expert report, is ultimately harmless and should be permitted.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the *Daubert* Motion is GRANTED–IN–PART. Mr. Desch will be precluded from testifying (1) about Withrow's hand and body placement, and about the cause of Withrow's hand injuries; (2) about the Mock–Up Test and any opinions based on it; and (3) as to whether Withrow violated particular Delaware motor vehicle laws. Lastly, it is hereby ORDERED that Plaintiff's Motion to Strike is DENIED. The Bove Reply will be allowed, and Dr. Bove will be permitted to testify at trial.

at \*16–22. While these latter two factors played a key role in the *Pennypack* analysis in *Wyeth,* they are now not present here.

